[No. A042129. First Dist., Div. One. Dec. 21, 1989.]

NORTHWOOD HOMES, INC., Plaintiff and Appellant, v.
TOWN OF MORAGA et al., Defendants and Respondents.

**COUNSEL**

Ellman, Burke & Cassidy, Howard N. Ellman, Stephen K. Cassidy and Kenneth N. Burns for Plaintiff and Appellant.

McDonough, Holland & Allen, William L. Owen and Michelle Marchetta Kenyon for Defendants and Respondents.

**OPINION**

**RACANELLI, P. J.**—Northwood Homes, Inc. (Northwood), appeals from the judgment below denying its challenge to the validity of an "open space ordinance" adopted as an initiative measure by the voters of the Town of Moraga. We will affirm for the reasons we explain.

### FACTS

In 1980, Northwood, an experienced real estate developer, acquired an option to purchase two large undeveloped tracts of land situated in Moraga. One tract covers approximately 97 acres on Campolindo Ridge, the other some 307 acres on Mulholland Ridge. Rheem Valley, largely developed as a residential area, lies between the two ridges.

In the fall of 1980, Northwood submitted an application for approval of a conceptual development plan for the development of 169 units on the 404 acres. In 1984, after years of studies, negotiations and hearings, the Moraga Planning Commission ultimately approved tentative subdivision maps for

19 units on the smaller tract and 91 units on the larger tract. (The total number of units approved represented a reduction of 59 units from Northwood's initial proposal.)

In approving the tentative subdivision maps, the Moraga Planning Commission expressly found, inter alia, that the sites were physically suitable for the density proposed and that the subdivision as designed was unlikely to cause substantial environmental damage. As a condition of approval, Northwood was required to dedicate 330 acres—over 80 percent of the property—as permanent open space, to repair certain landslides and to indemnify Moraga from any liability in connection with the landslides.

Upon obtaining such approval, Northwood exercised its option to purchase the property and began the process of obtaining final subdivision map approvals.

In March 1985, a group of Moraga residents from the Rheem Valley area formed a homeowners' association in an avowed effort to stop the Northwood project. The homeowners' association urged the town council to place a moratorium on development of open space lands while the open space element of the general plan was studied. The town council agreed but announced its intention to exempt the Northwood project from the moratorium. Thereafter, certain Moraga citizens, including some of the officers and directors of the homeowners' association, drafted an initiative measure—"Moraga Open Space Ordinance" (hereafter MOSO)—and qualified it for the ballot.[1]

On April 8, 1986, the measure was approved by the Moraga electorate.

MOSO amends the open space element of the Moraga general plan to limit the density of development on lands designated as open space and to prohibit development on slopes greater than 20 percent and within 500 feet of a major ridge. MOSO also repeals the general plan amendments authorizing the Northwood project, redesignating the land "Public Open Space-Study," and rezones the property as "open space."

Upon passage of MOSO, Moraga officials temporarily refused to continue processing Northwood's application for approval of the final subdivision maps until implementing legislation could be enacted. Moraga then invited Northwood to seek a status determination on how the property could be developed. Northwood declined and instead filed suit in July 1986 seeking

---

[1] The president of the association appeared at a town council meeting and declared that the association would not circulate the petition if the council included Northwood's land in the moratorium.

to invalidate MOSO. After a 10-day court trial, the court denied Northwood's petition for relief and entered judgment in favor of defendants. This appeal ensued.

## DISCUSSION

### I.  *Validity of MOSO*

Northwood chiefly argues that the MOSO is an invalid exercise of the police power because: 1) it fails to accommodate regional housing interests; and 2) it unfairly discriminates against Northwood's development project. Northwood also argues that even if the MOSO is found valid, it cannot be applied to the Northwood project because the tentative map approvals gave Northwood a vested right to proceed toward final approval of its project. However, Northwood candidly concedes that the latter argument is contrary to the dispositive holding in *Avco Community Developers, Inc.* v. *South Coast Regional Com.* (1976) 17 Cal.3d 785 [132 Cal.Rptr. 386, 553 P.2d 546].[2]

### A.  *Regional Impact*

Northwood eloquently traces the historical significance of *regional* housing policies intended to avoid abusive land use restrictions by individual municipalities. Indeed, both the Legislature and the courts have long recognized the statewide importance of a *regional* perspective.

Under the provisions of the California Planning and Zoning Law (Gov. Code, § 65000 et seq.), a housing element is required in each municipal general plan (Gov. Code, §§ 65580-65589.8), which must also include the municipality's share of *regional* housing needs (Gov. Code, §§ 65583, subd. (a)(1), 65584). And the California Supreme Court has determined that local land use regulations must adequately address the welfare considerations of the *region.* (*Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038]; see also *City of Del Mar* v. *City of San Diego* (1982) 133 Cal.App.3d 401 [183 Cal.Rptr. 898].)

In *City of Livermore,* the court was called upon to decide the validity of a local initiative ordinance prohibiting issuance of further residential building permits until local schools, sewers and water supplies met certain standards.

---

[2] Northwood states it raises the point "simply to preserve it should this case reach the California Supreme Court." Accordingly, we deem that argument abandoned and do not discuss it.

In reaffirming the established principle that determination of the challenged validity of a local land use ordinance is to be made under the standard whether that ordinance is reasonably related to the public welfare (18 Cal.3d at p. 607), the court explained that the "public welfare" to be examined is not confined to the welfare of the enacting municipality and its residents but includes considerations of the welfare of the relevant region when the ordinance significantly affects nonresidents. (*Ibid.*)

■  *City of Livermore* spells out a three-step analysis to be undertaken by trial courts in determining whether a challenged restriction reasonably relates to the regional welfare: first, to forecast the probable effect and duration of the restriction; second, to identify the competing interests affected by the restriction (for example, existing residents seeking to limit residential expansion for environmental reasons as opposed to "outsiders" seeking a place to live and an opportunity to share in community benefits); and finally, to determine whether the ordinance, in light of its probable impact, represents a reasonable accommodation of the competing interests. (*Associated Home Builders etc., Inc.* v. *City of Livermore, supra*, 18 Cal.3d at pp. 608-609.)

■  In the present case, the trial court was fully aware of its obligations under *City of Livermore* but concluded that a regional analysis was unnecessary because MOSO had no significant effect on the region.[3] While accepting Northwood's assertion that the effect of MOSO was to reduce new housing construction in Moraga during 1980-1990 by 113 units, the court nonetheless found this effect to be de minimis. The trial court concluded that MOSO bears a reasonable relation to the general welfare in light of the evidence that reduction in development on slopes will reduce the risk of landslides and increase aesthetics in Moraga. That conclusion is not disputed. The only question presented is whether the trial court should have considered the effect on the *regional* housing supply.

We believe the tripartite test under *City of Livermore* was correctly employed by the court. "[T]he proper constitutional test is one which inquires whether the ordinance reasonably relates to the welfare of those whom it *significantly* affects. . . . [I]f . . . the ordinance may *strongly* influence the . . . entire metropolitan region, judicial inquiry must consider the welfare of that region." (*Associated Home Builders etc., Inc.* v. *City of Livermore, supra*, 18 Cal.3d at p. 607, italics added.) Thus, the threshold question is whether the land use restriction has a significant impact on the region.

___

[3] The court reasoned, in part, that the "mere loss of 113 units cannot be said to be significant or substantial on this record. The evidence shows that over 60,000 dwelling units are scheduled for construction in Contra Costa County for the 1980-90 period and over 300,000 in the Bay Area."

(*County of Butte* v. *Bach* (1985) 172 Cal.App.3d 848, 862 [218 Cal.Rptr. 613].) Since the trial court found no significant regional impact on the state of the evidence presented, that finding is binding on appeal.

Northwood insists, however, that an arithmetic analysis is overly simplistic because, considered in isolation, every municipal housing restriction will be minimal compared to the Bay Area region. Northwood vigorously contends that MOSO must be considered in connection with the exclusionary policies of *other* communities so that the *cumulative* effect on the entire region is scrutinized. It seems apparent that the trial court did not reject the suggested approach; it simply determined that Northwood failed to meet its burden of proof.[4]

Given this pivotal determination, we are impelled to affirm the challenged decision. It bears repetition that the trial court did not exclude the possibility that a regional impact could be shown as a result of the collective effect of land use restrictions of the several surrounding communities. Instead, it grounded its decision on Northwood's failure to present satisfactory evidence of any significant effect on the regional housing supply.[5]

Northwood additionally argues that the trial court should have considered the cumulative effect of MOSO and Moraga's *other* land use restrictions—especially its policy of obtaining open space commitments from developers as a condition of approval—which have caused Moraga to fall far short of its housing needs objectives.[6]

---

[4] The court's dispositive reasoning is reflected in its straightforward language: "Petitioners argue that to find a reduction of 113 units insignificant would vitiate a regional welfare test for most Bay Area cities since their housing needs are small in comparison to those of a county or the Bay Area. Such a conclusion does not follow, in the Court's view. Rather, each case must be decided on its individual facts with the party asserting the regional claim having the burden of proof. (*Associated Home Builders, supra,* 18 Cal.3d at p. 609.) The Court finds here only *that petitioners have not met their burden of proof.*" (Italics added.)

[5] The evidence relied on by Northwood largely consists of vague generalizations about the impact of growth control measures. One expert's report declared, "Growth controls have cumulative effects . . . ." But the report gave no specific analysis of those cumulative effects or how they affected the region. Another report concluded MOSO and other housing inhibitions in the region will exacerbate the housing shortage. But that report reveals no pertinent statistics of the housing shortfall except as to Moraga (113 fewer units under MOSO).

[6] As previously noted, every municipality must adopt a housing element as part of its general plan analyzing housing needs and scheduling development programs. (Gov. Code, § 65583.) The housing element must also identify the municipality's share of regional housing needs as determined by the council of governments. (Gov. Code, §§ 65583, subd. (a); 65584.) For the 5-year, 1983-1988 period, Moraga's housing needs were determined to be 894 units. For the 10-year period, 1980-1990, the number was 1,248 units. Northwood's experts predicted that even without MOSO, Moraga would fall short of its 10-year goal by 485 units.

The point argued *was* considered by the trial court, albeit in a slightly different context, and rejected.[7] On appeal, Northwood reframes its argument to assert that the trial court should have considered the effect on the regional welfare of Moraga's *total* shortfall—not just the loss of 113 units—in meeting its housing needs. But the analysis undertaken by the trial court seems equally applicable to the argument recast by Northwood. The housing needs identified in the general plan are simply goals, not mandated acts. (See *Selby Realty Co.* v. *City of San Buenaventura* (1973) 10 Cal.3d 110 [109 Cal.Rptr. 799, 514 P.2d 111].) In any event, we think the crucial inquiry under these circumstances is whether the *challenged* ordinance had a significant regional impact and is reasonably related to the regional welfare. We are unaware of any authority for undertaking a *cumulative* analysis for purposes of determining the constitutional validity of a single ordinance. Thus, the argument is found to be without merit.

### B. *Discriminatory*

■ With heavy emphasis placed on *Arnel Development Co.* v. *City of Costa Mesa* (1981) 126 Cal.App.3d 330, 334-337 [178 Cal.Rptr. 723] (*Arnel II*), Northwood next argues that MOSO is invalid because it unfairly discriminates against a single development.

In *Arnel II,* the city had approved a final development plan and a tentative tract map for an apartment complex for moderate income tenants. Shortly thereafter, a local homeowner's association circulated an initiative petition to rezone the parcel to single family residential. The qualified initiative measure was subsequently adopted by the voters. Thereafter, the city refused to proceed with the developer's applications for a final tract map and building permits.

Although the trial court found that the ordinance failed to consider the city's general plan or other land use regulations and was specifically targeted at the Arnel development, it upheld the ordinance based on its determination that the initiative measure reasonably related to the affected local and regional welfare. On appeal, the court noted that the city's approval of Arnel's plan had come after 18 months of study and deliberation. "The initiative ordinance rezoning the property was adopted 16 months later

---

[7] In responding to Northwood's contention that MOSO was defective in curing a shortage of mandated housing needs, the court stated it found "no authority . . . which indicate that the statutory expressions as to housing needs create causes of action if those needs are not met. More importantly, the jury is still out on whether Moraga will meet its housing needs since the five and ten years [*sic*] periods have not as yet been reached. It would be inappropriate to strike down an initiative on prognostications as to the future given a reasonable difference of opinion as to whether the needs will be met and at least the possibility that Moraga's goals may be altered under its new land use policies."

without evidence of any significant change in conditions or circumstances and for the sole . . . purpose of defeating the Arnel development." (126 Cal.App.3d at p. 335.) The Court of Appeal reversed the trial court's conclusion of validity and held the ordinance invalid as an arbitrary and discriminatory measure. (*Id.*, at p. 337.)

Northwood argues that *Arnel II* is factually parallel and controlling herein. The trial court below found that *Arnel II* was factually distinguishable in that the challenged MOSO was designed to stop hillside development *in general* and not just Northwood's project in particular.[8] This finding must be upheld.

There is substantial evidence in the record that the Moraga hillsides are unstable and periodically plagued with landslides and mud slides. Even before MOSO, the town's general plan and implementing ordinances included restrictions on slope and ridge top development. During the early public hearings on the Northwood development proposal, Moraga citizens expressed considerable concern about building on lands prone to slides. Indeed, the planning commission recommended *reducing* the density of the project for precisely that reason: the instability of the soil and the degree of slope of the site. It appears that much of the debate surrounding MOSO focused on the inadequacy of the general plan. And the effect of MOSO was to amend the general plan in order to place more stringent restrictions on hillside development *generally.*

Undaunted, Northwood contends that the trial court overlooked the fact that the environmental issue was merely a "smoke screen" raised by the initiative proponents to disguise their true purpose (circumvention of *Arnel II* constraints) in an effort to stop the Northwood development. The contention is overstated. Again, the trial court carefully considered the point but, after weighing the evidence, ultimately rejected it.[9]

---

[8] The court, in underscoring the major differences between the *Arnel II* and MOSO election campaigns, noted that: "Here, the major attack was against development on hillsides generally. The voters were given a choice between the status quo of existing policies on hillside development or a significantly more restrictive policy on future hillside development in the entire community."

[9] The court's appreciation of the conflicting interests involved is clearly reflected in the record: "While there is evidence of great antipathy to Northwood's projects and a desire to thwart them, there is also evidence of a general campaign on the merits of hillside development. In other words, while Northwood was a target of at least some initiative proponents, that was a part of another more generalized focus of the initiative: to preclude the type of development of which Northwood's projects were an example. The Court finds that *Arnel* does not invalidate an initiative focused, as here, on both specific projects and generalized development policies. If the law were otherwise, parties aroused by a single governmental action could not use such action as a basis for changing general governmental policy through an initiative vote."

Given the existence of competent evidence that MOSO had broader application than merely rezoning Northwood's particular property, the trial court could reasonably find, as it did, that the ordinance did not have a discriminatory purpose or effect. Accordingly, that finding must be upheld.

## II. *Validity of Guidelines*

After the adoption of MOSO, the planning commission staff prepared a set of "guidelines" to implement the ordinance, which were ultimately approved by the town council. ■ Northwood now claims these guidelines are invalid because they were enacted without compliance with the requirements of the California Environmental Quality Act (CEQA). The trial court rejected the argument, concluding that the guidelines were exempt from CEQA. We think that ruling was correct.

CEQA's requirement of an environmental impact report applies to "discretionary projects proposed to be carried out or approved by public agencies, including, but not limited to, the enactment and amendment of zoning ordinances, . . ." (Pub. Resources Code, § 21080, subd. (a).) The definition of a "project" is further explained in the CEQA guidelines to include "enactment and amendment of zoning ordinances, and the adoption and amendment of local General Plans or elements thereof . . . ." (Cal. Code Regs., tit. 14, § 15378, subd. (a)(1); see generally *City of Santa Ana* v. *City of Garden Grove* (1979) 100 Cal.App.3d 521 [160 Cal.Rptr. 907] [amendment of general plan is a project].)

But an initiative measure is expressly *excluded* from the definition of a project. (Cal. Code Regs., tit. 14, § 15378, subd. (b)(4); *Stein* v. *City of Santa Monica* (1980) 110 Cal.App.3d 458, 460 [168 Cal.Rptr. 39].) When the electorate undertakes to exercise the reserved legislative power, the city has no discretion and acts as the agent for the electorate. In such event, the enactment of the initiative measure is excluded from CEQA compliance. (*Id.*, at pp. 460-461.) Thus, there can be no question that MOSO itself is valid without the necessity of environmental review.

Additionally, CEQA also excludes from the definition of a project "[c]ontinuing administrative activities, such as . . . general policy and procedure making (except as they are applied to specific instances covered above); . . ." (Cal. Code Regs., tit. 14, § 15378, subd. (b)(3).) We think the general guidelines enacted to implement MOSO are encompassed within this provision. They do no more than provide the procedural implementation (e.g., definitions of terms, application procedures) of the land use decisions reflected in MOSO—itself an enactment exempt from CEQA re-

quirements.[10] We conclude that the adoption of MOSO guidelines was not a "project" requiring environmental review.

Nor does our holding in *City of Livermore* v. *Local Agency Formation Com.* (1986) 184 Cal.App.3d 531 [230 Cal.Rptr. 867] [county LAFCO revision of sphere-of-influence guidelines constitutes a project requiring an EIR], compel a different conclusion. In that case, this court (Div. 2) rejected the argument that the guidelines were excluded from CEQA under title 14, section 15378 of the California Code of Regulations on the basis that: "The policymaking performed by LAFCO when it revises guidelines is far different than and distinguishable from the ministerial policymaking referred to in this CEQA guideline." (184 Cal.App.3d at p. 539.) The court reasoned in part that the guideline revisions were analogous to the amendment of a general plan in that they had a "potential impact" on the environment necessitating their consideration as a project under CEQA. (*Ibid.*)

Here, in marked contrast to the LAFCO guidelines, the MOSO guidelines were essentially *ministerial*—designed to implement the land use policy decisions already reflected in MOSO. Finally, since Northwood presented no evidence bearing on this issue, there is no showing in the record of the potential effect, if any, that MOSO guidelines will have on the environment.

The judgment is affirmed.

Newsom, J., and Stein, J., concurred.

---

[10] By way of example, pursuant to MOSO, development on lands designated open space is limited to one unit per twenty acres in "high risk areas." Under the guidelines, an area is deemed "high risk" if it has any one of the following characteristics: 1) located within 100 yards of landslide area or area with history of soil slippage; 2) serves as drainage way; 3) located within 100 feet of a fault line; 4) located within 100 feet of a creek; 5) located within 100 yards upstream or 500 yards downstream of pond or reservoir; or 6) contains a regular or intermittent spring.