*1103
 
 Opinion
 

 WORK, Acting P. J.
 

 The sole issue presented by this appeal is whether the housing element in the City of San Diego’s (City) general plan substantially complies with Government Code
 
 [1]
 
 section 65583, subdivision (c)(1). This provision requires City to identify adequate sites it will make available as part of a plan designed to facilitate and encourage development of homeless emergency shelters and transitional housing. We conclude City’s amended housing element, which contains blanket developmental and separation restrictions on the siting of residential care facilities anywhere within City, does not substantially comply with the legislative mandate to identify sites which its action program will make available to satisfy City’s quantified objectives for the homeless. Accordingly, we affirm the judgment with directions the trial court stay for 60 days its order that City approve all conditional use permit (CUP) applications for emergency shelters and transitional housing until it has complied with section 65583, subdivision (c)(1), to permit City to comply with the legislative mandate as interpreted by this court.
 

 Factual and Procedural Background
 

 On November 18, 1994, Kevin Hoffmaster and Joan Sun (petitioners) petitioned for writ of mandate and asked for injunctive and declaratory relief asserting the housing element in City’s general plan had not been timely revised and failed to include sufficient planning for the homeless population. The trial court found City had failed to adopt the statutorily mandated housing element by July 1, 1991, as required by section 65588, subdivision (b)(3) and ordered compliance within 120 days. On March 21, 1995, City adopted a housing element update.
 
 [2]
 
 Petitioners, as class representatives for homeless persons within City, promptly filed their first amended petition for peremptory writ of mandate and complaint for injunctive relief, challenging the adequacy of the revised housing element for, among other reasons, failing to comply with section 65583, subdivision (c)(1) by neither properly designating adequate real property sites which City would make available for homeless emergency shelters and transitional housing, nor providing a five-year action plan to implement the goals and policies of the housing element by various means, including facilitating the development of emergency shelters and transitional housing on designated sites. In defense, City asserted its element contained an adequate site inventory of land, stated its goal to increase the construction of housing, and suggested means of minimizing governmental restraints to housing development.
 

 
 *1104
 
 On October 10, the trial court concluded the element neither adequately identified sufficient emergency shelter and transitional housing sites nor included an action program to make those sites available. The court declared: “The housing element does not adequately identify emergency shelter and transitional housing sites that will be made available, as required by Government Code section 65583 (c)(1), in light of the fact that the element, at page 67, table 20, identifies an unmet need. Respondents are ordered to identify adequate sites for emergency shelters and transitional housing and propose an action program to make these sites available.” On January 30, 1996, City amended the housing element by including maps purportedly showing all vacant and infill/redevelopment land within its boundaries and generally declaring they are potential sites for emergency shelters and transitional housing. It also included maps locating existing emergency shelters and transitional housing and the homeless population by geographical subarea; a discussion of its residential care facility ordinance; a summary of its “Good Neighbor Policy”; and a description of its 1995-1996 inclement weather program.
 

 On March 8, 1996, the trial court ordered City to provide evidence “substantiating that its proposed action plan will result in adequate sites for emergency shelters [and] transitional housing to meet the needs of the homeless within 5 years.” Specifically, the court ordered City to present evidence as to how generally designating all unbuilt lots as potential sites and stating its intent to increase the stock of housing through public/private partnering, will, within 5 years, meet the needs of the 3,424 homeless persons City had identified as having been unmet.
 
 [3]
 

 Noting the Legislature recognized in section 65583, subdivision (b)(2) a community may not be financially able to insure shelter for its entire identified homeless population, City argued it is not statutorily required to present a plan designed to meet the
 
 entire
 
 recognized homeless housing need within five years. City acknowledged it had no evidence its program would meet the entire needs of all the homeless within five years, but that its housing element was a sincere effort to provide for the homeless. At the final hearing before the writ issued, petitioners’ counsel argued section 65583, subdivision (c)(1) requires City to identify adequate sites which would be available based on the total recognized need, even though its action plan
 
 *1105
 
 need only address fulfilling a reasonable and acceptable quantified objective consistent with its own ability to obtain funding. He stated: “This is not an issue of cost where we’re asking the City to spend millions of dollars. It’s an issue of the City complying with the law by allowing through development, zoning and regulation standards adequate sites that will be made available. These needs, these beds, can be filled if we allow private providers to fill the need simply because they won’t have to go through this conditional use permit process that effectively precludes this need from being filled, the City saying we don’t have the money to fill it, but we’re not going to let anybody else fill it because we have this C.U.P. process, and the reason they have that process, it’s a political issue .... We’re not asking the City to spend $120 million, we’re asking them to allow these sites to be made available, as the law requires, through appropriate zoning and development standards ....’’ The court then responded: “Well, I think that’s precisely my interpretation of the entire situation. I don’t expect the City to come up with $120 million plus the cost of services. That’s not my place to do that. Or to cause that to be entered into my evaluation of whether or not the adequacy of the Plan has been established. But certainly, by, I think, the City’s own admission, either expressed or implicitly, the need that the Task Force has identified and the City’s acknowledging that need and its concession that it can’t meet that need, which I believe this whole scenario reflects, means that it has not met the basic mandates of the Government Code.”
 
 [4]
 

 On April 18, the trial court issued a final judgment and peremptory writ of mandate finding City had not complied with section 65583, subdivision (c)(1) and ordered it to approve all CUP applications for emergency shelters and transitional housing until it complied with the statute.
 

 Governing Standard of Review
 

 The adoption and revision of housing elements are legislative acts reviewed pursuant to Code of Civil Procedure section 1085. Our initial review is to determine whether the housing element “substantially complies” with article 10.6 (commencing with section 65580) of chapter 3 of the Planning and Zoning Law. (§ 65587, subd. (b);
 
 Hernandez
 
 v.
 
 City of Encinitas
 
 (1994) 28 Cal.App.4th 1048, 1058 [33 Cal.Rptr.2d 875];
 
 Black Property Owners Assn.
 
 v.
 
 City of Berkeley
 
 (1994) 22 Cal.App.4th 974, 980 [28 Cal.Rptr.2d
 
 *1106
 
 305].) “Substantial compliance means actual compliance with respect to the substance essential to every reasonable objective of the statute, as distinguished from simple technical imperfections of form.”
 
 (Ibid.; Hernandez
 
 v.
 
 City of Encinitas, supra,
 
 28 Cal.App.4th at pp. 1058-1059;
 
 Buena Vista Gardens Apartments Assn.
 
 v.
 
 City of San Diego Planning Dept.
 
 (1985) 175 Cal.App.3d 289, 297-298 [220 Cal.Rptr. 732];
 
 Camp
 
 v.
 
 Board of Supervisors
 
 (1981) 123 Cal.App.3d 334, 348 [176 Cal.Rptr. 620].) In determining substantial compliance, we do not examine the merits of the element or the municipality’s underlying wisdom in determining policy.
 
 (Black Property Owners Assn.
 
 v.
 
 City of Berkeley, supra,
 
 22 Cal.App.4th at p. 980;
 
 Buena Vista Gardens Apartments Assn.
 
 v.
 
 City of San Diego Planning Dept., supra,
 
 175 Cal.App.3d at p. 298.) Rather, “[i]f the municipality has substantially complied with the statutory requirements, the reviewing court will not interfere with the municipality’s legislative action in updating or amending the elements of its general plan, unless the action was arbitrary or capricious or entirely lacking in evidentiary support.”
 
 {Black Property Owners Assn.
 
 v.
 
 City of Berkeley, supra,
 
 22 Cal.App.4th at p. 980.) Because the issue of substantial compliance is one of law, we must exercise our independent judgment.
 
 (Hernandez
 
 v.
 
 City of Encinitas, supra,
 
 28 Cal.App.4th at p. 1059;
 
 Black Property Owners Assn.
 
 v.
 
 City of Berkeley, supra,
 
 22 Cal.App.4th at p. 980.)
 

 The Mandate of Section 65583, Subdivision (c)(1)
 

 The availability of housing is a matter of “vital statewide importance” and “the early attainment of decent housing and a suitable living environment for every California family is a priority of the highest order.” (§ 65580, subd. (a).)
 

 City is required to adopt a comprehensive, long-term general plan for its physical development (§ 65300)—an “integrated, internally consistent and compatible statement” of City policies (§ 65300.5) with stated “objectives, principles, standards and plan proposals” for each mandatory element (§ 65302). A housing element is mandated (§ 65302, subd. (c)). (See
 
 Buena Vista Gardens Apartments Assn.
 
 v.
 
 City of San Diego Planning Dept., supra,
 
 175 Cal.App.3d at pp. 294-295.)
 

 The Legislature has expressly acknowledged the severe crisis caused by the lack of available shelter for California’s homeless population, one cause of which was the scarcity of low-cost housing. (Stats. 1984, ch. 1691, § 1, p. 6105; Stats. 1986, ch. 1383, § 1, p. 4929.)
 
 [5]
 
 The Legislature further declared attainment of its housing “goal” requires “cooperative participation” between the government and private sector (§ 65580, subd. (b)), cooperation
 
 *1107
 
 among all levels of government (§ 65580, subd. (c)), and use of state and local governmental power “to facilitate the improvement and development of housing” for “all economic segments of the community” (§ 65580, subd. (d)).
 
 (Buena Vista Gardens Apartments Assn.
 
 v.
 
 City of San Diego Planning Dept., supra,
 
 175 Cal.App.3d at p. 295.)
 

 Of relevance here, the Legislature stated its statutory scheme is intended to assure cities contribute by preparing and implementing housing elements which, along with federal and state programs, move toward attaining the state housing goal. (§65581, subds. (a), (b).) The Legislature recognized each locality is “best capable of determining what efforts are required by it to contribute to the attainment of the state housing goal, provided such a determination is compatible with the state housing goal and regional housing needs.” (§ 65581, subd. (c).)
 

 The mandatory housing element “shall consist of an identification and analysis of existing and projected housing needs and a statement of goals, policies, quantified objectives, financial resources, and scheduled programs for the preservation, improvement, and development of housing. The housing element shall identify adequate sites for housing, including rental housing, factory-built housing, and mobilehomes, and shall make adequate provision for the existing and projected needs of all economic segments of the community.” (§ 65583.) The housing element shall further include a statement of the community’s goals, quantified objectives and policies regarding maintaining, preserving, improving and developing policies. (§ 65583, subd. (b)(1).) However, the Legislature also recognized: “[T]he total housing needs identified pursuant to subdivision (a) may exceed available resources and the community’s ability to satisfy this need within the content of the general plan requirements outlined in Article 5 (commencing with Section 65300).
 
 Under these circumstances,
 
 the quantified objectives need not be identical to the total housing needs. The quantified objectives shall establish the maximum number of housing units by income category that can be constructed, rehabilitated, and conserved over a five-year time period.” (§ 65583, subd. (b)(2), italics added.)
 

 Although a local government’s quantified objectives need not be identical to its total housing needs where available resources in both the public and private sectors are not adequate to meet the cited need, they must represent
 
 *1108
 
 the maximum number of housing units by income category which can be constructed, rehabilitated and conserved over the statutory time period. (§ 65583, subd. (b)(2).) Consequently, the housing element must contain quantitative analyses supporting the conclusion the local government and the community cannot meet the acknowledged need and the maximum number of housing units by income category which the local government projects can be constructed, rehabilitated and conserved over the five-year time period. (See
 
 Buena Vista Gardens Apartments Assn.
 
 v.
 
 City of San Diego Planning Dept., supra,
 
 175 Cal.App.3d at p. 305.) These analyses are to be based on comprehensive assessments of current and anticipated economic and market conditions and available resources in light of reasonable prioritization of municipal goals given the legislative determination of the preeminent importance of an adequate housing element within a general plan (see
 
 Committee for Responsible Planning
 
 v.
 
 City of Indian Wells
 
 (1989) 209 Cal.App.3d 1005, 1013 [257 Cal.Rptr. 635]). Needless to say, underestimated quantified objectives will render a housing element less meaningful and less responsive to acknowledged housing needs, potentially skewing the legal determination of whether a municipality’s schedule-of-action program substantially complies with the legislative mandate.
 

 Further, the housing element shall include “[a] program which sets forth a five-year schedule of actions the local government is undertaking or intends to undertake to implement the policies and
 
 achieve the goals and objectives
 
 of the housing element through the administration of land use and development controls, provision of regulatory concessions and incentives, and the utilization of appropriate federal and state financing and subsidy programs . . . .” (§ 65583, subd. (c), italics added.) To adequately provide for the housing needs of all economic segments, the program must “[i]dentify adequate sites
 
 which will be made available through appropriate zoning and development standards and with public services and facilities needed to facilitate and encourage the development
 
 of a variety of types of housing for all income levels, including multifamily rental housing, factory-built housing, mobilehomes, emergency shelters, and transitional housing
 
 in order to meet the community’s housing goals as identified in subdivision
 
 (6).” (§ 65583, subd. (c)(1), italics added.)
 
 [6]
 
 Moreover, the program must assist in developing adequate housing to meet the needs of low- and moderate-income households, as well as to “[a]ddress and, where appropriate and
 
 *1109
 
 legally possible, remove governmental constraints to the maintenance, improvement and- development of housing.” (§ 65583, subd. (c)(2), (3).)
 

 City correctly asserts the trial court’s order that it identify adequate sites which will be made available through its action program to meet the identified housing needs of all the homeless population is inconsistent with the plain language of section 65583, subdivisions (b) and (c), insofar as it would require City to adopt a five-year action plan designed to eliminate the entire homeless population’s housing need within that time frame. Rather, the statutory scheme compels municipalities to look five years into the future and draft a “schedule of actions” designed to implement and achieve
 
 its
 
 housing policies and goals. Section 65583, subdivision (b)(2) recognizes that when City’s total housing needs exceed
 
 available resources and the community’s ability to satisfy this need
 
 within the content of the general plan, the element must set forth the
 
 maximum
 
 number of units by income category that it
 
 can
 
 construct, rehabilitate, and conserve over a five-year time period. Where the needs are greater than available resources, the quantified objectives need not be identical to the total housing needs. City’s quantified objectives were not directly challenged below and have not been argued on this appeal. Accordingly, section 65583, subdivision (c) requires the housing element here to set forth a five-year schedule of action City has undertaken or intends to undertake “to implement the policies and achieve the goals and objectives of the housing element,” not a plan to satisfy the total unmet needs of each population segment within its term. Similarly, section 65583, subdivision (c)(1) only requires City to identify adequate sites which its program will make available to facilitate and encourage development “in order to meet
 
 the community’s housing goals
 
 as identified in subdivision (b).” (Italics added.)
 
 [7]
 
 Consequently, to the extent the trial court’s order may reflect its belief section 65583 required City to identify sites and propose a schedule of actions to insure all its homeless housing needs will be met under these circumstances, its premise is faulty.
 

 Given that section 65583, subdivision (c)(1) requires City only to identify adequate sites which will be made available through its action program to meet its quantified objectives, if petitioners believe the community’s ability, incorporating both public and private sectors, to respond to the acknowledged unmet need is greater than projected by City, they should challenge the adequacy of the quantitative analysis underlying City’s determination the total homeless housing need exceeds its available resources and
 
 *1110
 
 the community’s ability to satisfy that need within the content of the general plan, and/or the quantitative analysis underlying its projected maximum number of housing units for the homeless which can be constructed, rehabilitated and conserved over the time period embraced by the element. Petitioners have challenged neither. The rebuttable presumption of validity of the housing element as to these issues under section 65589.3 controls given the California Department of Housing and Community Development advised City by letter dated April 21, 1995, that the housing element complied with section 65583. Evidence Code section 664 further establishes a presumption an official duty has been regularly performed.
 
 (Gentry
 
 v.
 
 City of Murrieta
 
 (1995) 36 Cal.App.4th 1359, 1385 [43 Cal.Rptr.2d 170].) Consequently, petitioners carry the burden of proof as to nonexistence of the presumed facts. (Evid. Code, § 606;
 
 Haycock
 
 v.
 
 Hughes Aircraft Co.
 
 (1994) 22 Cal.App.4th 1473, 1492 [28 Cal.Rptr.2d 248].) Absent any challenge as to the quantitative analyses supporting these determinations, we cannot review their legal adequacy.
 
 [8]
 

 City’s Amended Housing Element Fails to Substantially Comply With Section 65583, Subdivision (c)(1)
 

 City’s 1998 quantified objectives regarding the homeless are to have increased the aggregate number of inclement weather bed nights by 52,700 and the permanent bed capacity by approximately 200 a year since 1991. City notes its seven-year element (1991-1998) not only analyzes the homeless population housing needs in depth, but also inventories and maps City’s entire supply of land available for any type of residential use,
 
 *1111
 
 describes the permissible density, identifies zoning districts having land presently available for residential use, locates existing emergency shelters and transitional housing, and estimates the unsheltered urban homeless by subarea. Further, City asserts the amended housing element describes the condition of the infrastructure and public facilities for the land available for residential use. Having identified all available sites for residential use, City contends it has complied with section 65583, subdivision (c)(1), because each of these sites has the potential to be used for homeless housing. Finally, City points out its element discusses the specific policies and programs City is implementing to ensure its housing goals and objectives for the homeless are achieved.
 

 However, substantial compliance with the legislative mandate requires more than merely designating every unoccupied mote within City’s boundaries, each of which is subject to City-imposed developmental and separation restrictions for transitional residential care housing. Here, City concedes its quantified objectives will not meet the transitional housing need as to the homeless population. Under these circumstances where the quantified analyses underlying the deviation to quantified objectives and their validity have not been challenged, compliance with section 65583, subdivision (c)(1) requires City to identify adequate sites which will be made available for development of transitional housing to meet its quantified objectives. Our review persuades us City has not identified adequate sites which will be made available for development of transitional housing for the homeless to meet its quantified objectives. Thus, it has not substantially complied with section 65583, subdivision (c)(1).
 

 The Amended Housing Element includes a breakdown of available vacant, infill and redevelopment land where emergency shelters and transitional housing, in theory, could be sited.
 
 [9]
 
 Table 26 on page 96 of the element shows the amount of available land zoned at various density levels. This inventory identifies 11,125 acres which,
 
 potentially,
 
 could accommodate 95,123 net residential units. The table further shows that land zoned at 25 dwelling units or more per acre includes 912 acres which could accommodate 32,900 such units. Casting aside vacant land acreage, the available infill and redevelopment land of an aggregate of 1,711 acres could accommodate 25,417 net units. Mathematically, that amount of acreage, if truly “available,” could completely satisfy City’s quantified objectives, not only for the homeless, but for the entire housing needs for all groups of household incomes at or below moderate income. (Amended Housing Element, p. 3.)
 
 *1112
 
 In addition to the inventory of land appearing at pages 95-99 of the element, the Amended Housing Element includes two maps depicting where it suggests emergency shelters and transitional housing facilities could be located. (Amended Housing Element, pp. 137a-137b.) Map 4 on page 137a shows the location of vacant parcels of land where emergency shelters and transitional housing could potentially be sited, while map 5 on page 137b identifies such potential sites on infill/redevelopment land. These maps depict potential sites by density category. Consequently, the amended element contains an inventory of 95,123 acres of residential land where emergency shelters and transitional housing may be sited and identifies the location of such land by map—an inventory of its entire supply of land broken down by density. To place this inventory within context as to the homeless, City provides maps detailing the estimated unsheltered urban homeless population by planning subarea (Amended Housing Element, p. 67A, map 1), the location and bed capacity of existing emergency shelters (Amended Housing Element, p. 68, map 2), and the location and bed capacity of existing transitional shelters (Amended Housing Element, p. 68B, map 3).
 
 [10]
 

 This inventory, however, is simply that which is generally required under section 65583, subdivision (a)(3).
 
 [11]
 
 Although it identifies where emergency shelter and transitional housing for the homeless is most critically needed, subdivision (c)(1) requires more. To substantially comply with the identification of adequate sites requirement of subdivision (c)(1) here, City must provide an inventory of sites which will be made available through features of its program to meet its quantified housing objectives as to the homeless.
 
 [12]
 
 An adequate site is one available for immediate development,
 
 *1113
 
 which is located within reasonable access to public agencies and transportation services; will not require unusually high site development costs; has available public services and facilities; is consistent with the general plan designation and site zoning so as to permit the development of, conversion to or use of, a shelter or transitional housing without undue regulatory approval; and is consistent with applicable parking requirements, fire regulations and design standards. (Dept, of Housing & Community Development, Shelter for the Homeless: Housing Element Requirements (Oct. 1989) pp. 5-6.)
 
 [13]
 

 Petitioners argue City has not substantially complied with the identification requirement of adequate sites under section 65583, subdivision (c)(1), because it has failed to identify geographical zones where emergency shelter and transitional housing can be sited as a matter of right without the need for a CUP. Although we agree City has failed to substantially comply with section 65583, subdivision (c)(1), petitioners misread the statute. Section 65583, subdivision (c) requires City to adopt a five-year action program that it intends to undertake to implement its goals and objectives through land-use and development controls, regulatory concessions and incentives, federal and state financing and subsidy programs, etc. Under section 65583, subdivision (c)(1), City must identify adequate sites which will be made “available” through its action plan; it does not require City to designate geographical zones where shelter for the homeless may be built as a matter of right without a CUP, or for that matter, without complying with the underlying zoning of the area.
 
 [14]
 
 That is, the waiver of a CUP requirement is not the sine qua non of an adequate action program. Section 65583,
 
 *1114
 
 subdivision (c)(1) only mandates the waiver of a CUP where the site inventory under section 65583, subdivision (a)(3) fails to identify adequate housing sites to accommodate the need for groups of all household income levels pursuant to section 65584. That statute, which governs the determination and distribution of a municipality’s share of the regional housing needs, does not include emergency shelter and transitional housing for the homeless.
 
 [15]
 
 However, for identification to be meaningful, it must necessarily be specific. It must set forth sites which will be available to be developed, without restrictive zoning burdens which combined with the NIMBY (Not In My Back Yard) factor (discussed at length in separate council hearings) become insurmountable or produce protracted delays and deterrent cost increases. Available sites should be officially designated and publicized, preferably in the housing element, for this use. Finally, through its action program, City bears the responsibility to ensure the regulatory process actually encourages the development of emergency shelters and transitional housing. (§ 65583, subd. (c)(1).)
 
 [16]
 

 Here, as to City’s action program, the amended housing element describes City’s CUP ordinance, which applies to operators of such facilities. As mandated by state law, City’s residential care facility ordinance (San Diego Mun. Code, § 101.0581) allows emergency and transitional housing facilities to be sited in residential areas of City by right if they contain six or less beds. Other residential facilities may be sited by right if they comply with the underlying zoning and
 
 do not meet the definition of residential care facilities.
 
 (Amended Housing Element, pp. 137, A-47, as amended Jan. 30, 1996.) However, this exception is essentially illusory because San Diego Municipal Code section 101.0101.96 defines a residential care facility as any building which provides sleeping accommodations,
 
 with or without food services, for mentally disordered, disabled and dependent persons and those in rehabilitation, recovery and ward of the court programs, as well as facilities providing counseling services or receiving any form of governmental funding or subsidy.
 
 This definition appears to include all homeless persons, and as table 20 shows, a substantial portion of the identified homeless are those with special needs arising from severe mental illness, substance abuse, domestic violence and AIDS. (See
 
 post,
 
 appen. A.) During oral argument, City conceded economic inefficiencies make it unrealistic to suggest the
 
 *1115
 
 needs of this segment of its population ever can be met through facilities containing six or less beds.
 
 [17]
 
 In addition, the residential care facility ordinance contains a substantial geographical barrier limiting such facilities to one per lot or premises separated by a straight-line radius of no less than one-quarter mile to any other type of residential facility measured from property line to property line. (San Diego Mun. Code, § 101.0581D7.)
 
 [18]
 

 Consequently, through its blanket CUP requirement and the quarter-mile geographical restriction, the residential care facility ordinance as presently constituted substantially constrains siting homeless facilities for emergency shelter and meaningful transitional housing in any location within City.
 
 [19]
 
 We examine the remaining features of City’s program to determine whether the effect of this restrictive ordinance is sufficiently offset so that the housing element meaningfully identifies adequate sites available for development of both emergency shelter and transitional housing to meet City’s quantified objectives as to the homeless.
 

 City points to its “Good Neighbor Plan.” To facilitate the siting process, the amended housing element describes its policy to encourage operators of emergency shelters to contact potential neighbors and make a good faith
 
 *1116
 
 effort to resolve location issues before applying for a CUP. Patterned after a similar program in Portland, Oregon, the plan proposes to minimize potential community controversy at the time one applies for a CUP and after a facility becomes operational. If the issues cannot be resolved in advance of permit application, applicants and opponents have the option of mediation at
 
 applicant’s
 
 cost. (Amended Housing Element, p. 137.) However, the Good Neighbor Plan contains no provision requiring City to assist applicants in obtaining community approval for a CUP and the comments of council members at the January 1996 hearing strongly suggests City’s unwillingness to intervene in the process.
 

 The Amended Housing Element next describes City’s “homeless policy,” a program designed to provide the impetus for City to assist persons in an environment which encourages them to break the cycle of homelessness. According to its policy, City intends to coordinate business, social services and community groups; to continually assess the needs of the homeless; and to promote programs which stabilize those at risk of becoming homeless. (Amended Housing Element, p. 136.) City will assess needs annually so that current programs can be modified as necessary to be most efficient—an assessment responsibility greater than once every five years required under section 65583, subdivision (a)(6). (Amended Housing Element, p. 136.) Further, the element describes specific steps City is taking to ensure its goal of adding 200 or more permanent beds a year and 53,000 inclement weather shelter beds will be obtained, thus doubling the 1991 permanent bed capacity and increasing the 1991 inclement weather shelter bed capacity of 7,300 bed-nights to 60,000 bed-nights. (Amended Housing Element, p. 135, Tables 35, 36.) The element reveals City’s support for inclement weather and seasonal shelters by providing vouchers to pay for homeless residents to stay in hotels/motels and by directly funding emergency shelters. In 1995, City provided $145,000 in funding for inclement weather and seasonal shelters, an increase of approximately $100,000 from 1991. (Amended Housing Element, p. 136.) The element further notes future inclement weather programs are expected to provide greater geographic parity in order to serve the homeless city wide. (Amended Housing Element, p. 138.)
 

 As required by section 65580, subdivision (b), City encourages participation between government and the private sector to find long-term solutions to the homeless problem. Pursuant to this program, City has hired a city homeless coordinator who works with local providers to secure state and federal funding to implement the continuum of care concept. In 1995, these efforts secured a $7 million federal grant to fund three shelter programs for domestic violence victims, drug and alcohol addicts and the mentally ill. Further, City has created a homeless advisory committee and adopted a comprehensive homeless policy. City emphasizes these positive programs
 
 *1117
 
 will coordinate business, social services and community groups to promote programs designed to stabilize those at risk of becoming homeless and to restore the homeless to “optimum” community participation. (Amended Housing Element, p. 136.) Although since 1991 local service providers and City have emphasized emergency programs offering comprehensive, coordinated services for a longer term so as to promote greater self-sufficiency and a likelihood to break the cycle of homelessness, City asserts the “safety net” of providing emergency shelter has not been neglected. (Amended Housing Element, pp. 136, 203-204.) The element also provides redevelopment set-aside funds will be utilized to subsidize the purchase and rehabilitation of transitional housing for the lower income segment of the population. (Amended Housing Element, p. 203.) Under the new construction quantified objective, these funds will assist in developing 1,623 transitional units. (Amended Housing Element, pp. 203-204.)
 
 [20]
 

 While City’s planning efforts have been substantial and positive, the trial court correctly concluded it has failed to present an action program to offset the strictures of the residential care facility ordinance by identifying adequate sites which will be made available to meet City’s quantified objectives as to the housing needs of the homeless. The Good Neighbor Plan is insufficient. City’s homeless policy, although laudable and a necessary ingredient of any effective action program to address the needs of the homeless, contains no features to offset the effect of the residential care facility ordinance developmental restrictions. Within a zoning and land-use context, simply coordinating the resources and efforts of the public and private sectors does not identify sites “available” for development of emergency shelter and transitional housing for the homeless. Adequate funding and ownership of land does not equate to available usable sites, absent a program of zoning development controls, meaningful regulatory concessions and incentives which will permit and encourage such development. City’s
 
 *1118
 
 plan contains none. Consequently, City’s housing element does not adequately identify sites which will be made available for emergency shelters and transitional housing for the homeless through an action program designed to obtain City’s quantified housing goals as to the homeless.
 
 [21]
 
 In reaching this determination, we recognize our role is to simply determine whether the municipality has substantially complied with statutory requirements; it is not to delve into the merits of the stratagem proposed in the element or the underlying wisdom of the municipality’s determination of policy.
 
 (Black Property Owners Assn.
 
 v.
 
 City of Berkeley, supra,
 
 22 Cal.4th at p. 980;
 
 Buena Vista Gardens Apartments Assn.
 
 v.
 
 City of San Diego Planning Dept., supra,
 
 175 Cal.App.3d at p. 298.)
 
 [22]
 

 We conclude City’s amended housing element fails to substantially comply with the statutory mandate of identifying adequate sites which will be available through an action program for development of emergency shelters and transitional housing for the homeless in order to meet City’s quantified objectives. Because our interpretation of the legislative mandate in section 65583, subdivision (c)(1) differs from that of the trial court, we direct the trial court to stay for 60 days the order that City approve all CUP applications for emergency shelters and transitional housing until it had complied with section 65583, subdivision (c)(1) to permit City to comply with the legislative mandate as interpreted by this court.
 

 Disposition
 

 Judgment affirmed with directions the superior court stay its order 60 days to permit City to comply with section 65583, subdivision (c)(1). Petitioners are entitled to costs.
 

 McIntyre, J., and Jones, J.,
 
 *
 
 concurred.
 

 A petition for a rehearing was denied July 16, 1997, and appellants’ petition for review by the Supreme Court was denied September 24, 1997.
 

 
 *1119
 
 [[Image here]]
 

 [1]
 

 All statutory references are to the Government Code unless otherwise specified.
 

 [2]
 

 Although housing elements and updates by law cover a five-year time frame, this housing element update covers a seven-year time period, the result of legislative action in 1993.
 

 [3]
 

 The housing element relies on estimates of the San Diego Regional Task Force on the Homeless that there may be between 15,000 and 19,000 homeless persons in San Diego County. Excluding undocumented workers, more than half of the total are resident farm workers and day laborers. Within urban areas, there may be as many as 7,000 homeless. The highest concentration is in downtown San Diego, an estimated population of 4,500. (Amended Housing Element, pp. 63, 67.) The estimated unmet need for homeless shelter was 3,424, or 60 percent of that segment of the population. (Amended Housing Element, p. 67, table 20.)
 

 [4]
 

 City’s homeless services coordinator stated the limiting factor to providing all needed housing for the homeless is not space, but money. He declared the figure “generally used to calculate the cost of new construction” to build one living unit to house three people in San Diego is $105,000. Thus, he concluded to provide new housing for the entire unmet needs of the homeless would cost $119.8 million, while providing necessary social services would cost an additional $30.8 million. Rent subsidies for 1 year for 3,424 people would total approximately $22.5 million. In comparison, City’s budget for the 1996 fiscal year for the police department was $182.6 million.
 

 [5]
 

 Section 65583 was thus amended to include the homeless in the housing planning process by adding emergency shelters and transitional housing. (Stats. 1986, ch. 1383, § 2, pp.
 
 *1107
 
 4929-4931.) An “emergency shelter” is housing which has minimal support services for the homeless, has a limited stay of six months or less and is not withheld due to a client’s inability to pay. “Transitional housing” is such with supportive services, limited occupancy of up to two years and designed for the recently homeless with the ultimate goal of moving them to permanent housing as quickly as possible. (Cal. Code Regs., tit. 25, § 7950; see also Dept, of Housing & Community Development, Shelter For The Homeless: Housing Element Requirements (Oct. 1989) p. 5.)
 

 [6]
 

 Section 65583, subdivision (c)(1) further provides: “Where the inventory of sites, pursuant to paragraph (3) of subdivision (a), does not identify adequate sites to accommodate the need for groups of all household income levels pursuant to Section 65584, the program shall provide for sufficient sites with zoning that permits owner-occupied and rental multifamily residential use by right, including density and development standards that could accommodate and facilitate the feasibility of housing for very low and low-income households. For purposes of this paragraph, the phrase ‘use by right’ shall mean the use does not require a conditional use permit, except when the proposed project is a mixed-use project involving both commer
 
 *1109
 
 cial and residential uses. Use by right for all rental multifamily residential housing shall be provided in accordance with subdivision (f) of Section 65589.5.”
 

 [7]
 

 Parenthetically, we note identified housing needs, like quantified objectives, are simply goals, not mandated acts. (See
 
 Northwood Homes, Inc.
 
 v.
 
 Town of Moraga
 
 (1989) 216 Cal.App.3d 1197, 1204 [265 Cal.Rptr. 363].)
 

 [8]
 

 Nevertheless, we question the adequacy of City’s bare statement its resources are inadequate because the need is greater than the amount of money it has chosen to allocate for transitional housing, without justifying the limited amount allocated. If a municipality arbitrarily limits its financial allocation, it necessarily lowers its quantified objective. Nothing in the housing element supports City’s conclusion its funding sources cannot provide more than 200 permanent new beds per year.
 

 City’s homeless services coordinator stated: “Theoretically, the city could build and pay for all needed housing for the homeless. There are adequate sites in the City on which to locate the needed additional shelter, as illustrated in the Housing Element. The limiting factor is money .... The figure generally used to calculate the cost of new construction to build one living unit to house three people in San Diego is approximately $105,000.00. Thus, to build enough housing to accommodate 3,424 people, would cost approximately $119.8 million.” While the mathematics may be correct, it is absurd to suggest it is realistic to estimate the cost of housing the homeless by building separate living units housing only three people. There is no discussion of rehabilitating existing units or consideration of more cost-effective high density residential facilities. In any event, petitioners do not contend the housing element is defective in its quantified objective, regardless of how it was ascertained, but in its failure to identify sites. Petitioners do not ask for more money from City, but only that the plan identify sites where residential care facilities housing seven or more persons may be constructed when financing is obtained, from whatever source, with an easing of the CUP and geographical limitations imposed by city ordinance.
 

 [9]
 

 Redevelopment land constitutes property where intensification of the parcel is permitted along with a change in use. For instance, a single-family parcel could be converted into a multiple-family use or commercial use. In contrast, infill refers to land where intensification is permitted, but not a change in use. For instance, a single-family parcel could be split up into smaller lots for additional single-family units. (Amended Housing Element, p. 96, fn. 17.)
 

 [10]
 

 Regarding infrastructure, the element discusses the status of infrastructure required to serve the land identified in the inventory maps. The land zoned at 25 dwelling units or more per acre is located entirely within the urbanized or planned urbanized area of City. The infill/redevelopment land totaling 944 acres is located in the urbanized area and thus the basic infrastructure is already in place. (Amended Housing Element, pp. 99-100.) The vacant land, comprising 481 acres, is primarily located in the planned urbanized areas, where public facilities needed to serve the developments will be financed through development impact fees and facilities benefits assessments. (Amended Housing Element, p. 100.)
 

 [11]
 

 Section 65583, subdivision (a)(3) provides: “An inventory of land suitable for residential development, including vacant sites and sites having potential for redevelopment, and an analysis of the relationship of zoning and public facilities and services to these sites.”
 

 [12]
 

 The site identification requirement regarding emergency shelters and transitional housing for the homeless added by the 1986 amendment to section 65583 was the result of an express recommendation of the Department of Housing and Community Development’s publication, A Study of the Issues and Characteristics of the Homeless Population in California (Apr. 1985) at page 50. (Dept, of Housing & Community Development, Enrolled Bill Rep., Assem. Bill No. 1996 (1985-1986 Reg. Sess.) (Sept. 5, 1986).) Regarding the necessity for this requirement that local governments make adequate provision for emergency and transitional housing within their jurisdictions, the study reasoned: “Because of neighborhood resistance, many local governments have precluded the location of such housing in areas where the need
 
 *1113
 
 is critical. A specific requirement to address an identified need for emergency housing and to identify potential sites as part of the general planning law will begin to respond to this problem.” (Dept, of Housing & Community Development, A Study of the Issues and Characteristics of the Homeless Population in California,
 
 supra,
 
 at p. 50.)
 

 [13]
 

 We substantially rely on the Department of Housing and Community Development’s interpretation and published guidelines to local governments regarding compliance with the housing element law and specifically the requirement to identify adequate sites to facilitate the development of emergency shelters and transitional housing for the homeless under section 65583, subdivision (c)(1). Consistent administrative interpretation of a statute over a reasonable period of time, particularly by the agency charged with enforcing, implementing and interpreting the statutory scheme, is entitled to great weight.
 
 (Thornton
 
 v.
 
 Carlson
 
 (1992) 4 Cal.App.4th 1249, 1256-1257 [6 Cal.Rptr.2d 375];
 
 Kern
 
 v.
 
 County of Imperial
 
 (1990) 226 Cal.App.3d 391, 398 [276 Cal.Rptr. 524];
 
 Rizzo
 
 v.
 
 Board of Trustees
 
 (1994) 27 Cal.App.4th 853, 861-862 [32 Cal.Rptr.2d 892];
 
 DeYoung
 
 v.
 
 City of San Diego
 
 (1983) 147 Cal.App.3d 11, 17-18 [194 Cal.Rptr. 722].) Judicial departure from such administrative construction is warranted only where it is clearly erroneous or unauthorized.
 
 (Thornton
 
 v.
 
 Carlson, supra, 4
 
 Cal.App.4th at p. 1257;
 
 Kern
 
 v.
 
 County of Imperial, supra,
 
 226 Cal.App.3d at p. 398.)
 

 [14]
 

 This is not to say City, in its determination and implementation of policy, cannot on its own volition designate certain areas where shelters and transitional housing are permitted. For example, the City of Los Angeles has amended its municipal code to permit the establishment of shelters in high density residential and commercial zones subject to certain conditions
 
 *1114
 
 and limitations. (L.A. Mun. Code, §§ 12.03, 12.11A13, 12.14A44, 12.17.1A1, 12.21A4V, 12.27112.)
 

 [15]
 

 Section 65584 was enacted before the amendment to section 65583 to include emergency. shelter and transitional housing for the homeless and has not been amended to expressly cover such shelter and housing for the homeless.
 

 [16]
 

 We note, regarding the homeless, the trial court concluded the element adequately identified and analyzed governmental constraints as required by section 65583, subdivision (a)(4), as well as addressed their potential removal under section 65583, subdivision (c)(3).
 

 [17]
 

 In fact, petitioners estimate it would take 570 single-family residences housing 6 persons at a cost of $250,000 each for a total of approximately $145 million to meet the unmet need of 3,424 homeless persons identified in table 20.
 

 [18]
 

 The geographical restriction (as amended in 1994) reads in its entirety “[o]nly on [sic: one] residential care facility shall be permitted per lot or premise and shall be separated by a straight line radius of no less than one-quarter mile to
 
 any other type of residential facility
 
 measured from property line to property line.” (San Diego Mun. Code, § 101.0581D7, italics added.) It is not clear whether the ordinance is actually intended to prohibit a residential care facility property line from being within one-quarter mile of any residence or merely any other residential care facility as defined in section 101.0101.96, which excludes housing for the elderly, nursing and convalescent homes, or residential care facilities and other group homes. In addition, a residential care facility, by City’s definition, is “any building, or place which is maintained and operated to provide sleeping accommodations” with or without services. The definition is not limited to facilities housing seven or more persons, but even units housing a lesser number. Although City’s ordinance complies with state law by not requiring a CUP for residential care facilities housing six or fewer persons, the geographical separation prohibition is the same.
 

 [19]
 

 In
 
 Black Property Owners Assn.
 
 v.
 
 City of Berkeley, supra,
 
 22 Cal.App.4th 974, the rent control restriction which realistically inhibited new low-rent construction in the areas of Berkeley which were subject to it, was perceived by the city as being an incentive to developers to build in the uncontrolled zones. The reasoning was that because rents in those areas were not controlled, rents were increasing and that increasing rents created an incentive for developers to build more housing. Therefore, unlike here, Berkeley could legitimately argue it was not necessary to waive or set aside those rent controls in place to satisfy the housing act’s requirement for additional housing within the city as a whole. Here, City cannot argue that the CUP process blanketly imposed on all zones in City acts in any manner except as a deterrent to the free development of low-cost housing. Thus, unlike in
 
 Black,
 
 City’s plans should detail how, when and where the CUP restrictions can be mitigated so as to promote transitional and low-cost housing.
 

 [20]
 

 The Amended Housing Element further identifies various programs designed to assist those in low- or very low-income categories who are at risk of becoming homeless. These programs include an affordable housing density bonus program, a tax credit and bond program, and a single room occupancy hotel program which made 976 housing units available to those in the low- and very low-income categories. (Amended Housing Element, pp. 131-132.) The housing commission intends to construct or acquire approximately 550 public housing units in areas where new jobs are being created for very low-income individuals. (Amended Housing Element, p. 131.) As a result of these programs and others listed at pages 131-133 of the amended housing element, it is estimated that 4,300 new units for low-income and very low-income households will be constructed. (Amended Housing Element, p. 127.) Moreover, the element summarizes those programs aimed at preserving existing lower-income housing and rehabilitating 1,800 housing units for low-income individuals, as well as discusses programs pursued by City to benefit developers of affordable housing. (Amended Housing Element, pp. 148-168, 169-171, 174-180.) Finally, the element cites City programs which provide rental subsidies to 1,900 lower income residents. (Amended Housing Element, pp. 181-190.)
 

 [21]
 

 We acknowledge the Amended Housing Element notes City has more than met its quantified objectives per year from 1991 through 1995. (Amended Housing Element, p. 135, tables 35, 36.) This achievement was echoed in the March 20, 1996, declaration of Tom Leslie, City’s homeless services coordinator. However, that City has met its goals in prior years does not portend it shall do so in future years. Similarly, availability of sites in the past does not guarantee availability of sites in the future.
 

 [22]
 

 Insofar as the appellate record reveals City may have unreasonably delayed processing at least one CUP application for transitional housing for the homeless, we note the failure to do so in a timely fashion is inconsistent with the express legislative findings and goals regarding the plight of the homeless population. Adequate remedies exist to compel City to process such applications in good faith.
 

 *
 

 Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.