[No. A116690. First Dist., Div. Three. Mar. 18, 2008.]

ST. VINCENT'S SCHOOL FOR BOYS, CATHOLIC CHARITIES CYO, Plaintiff and Appellant, v.
CITY OF SAN RAFAEL, Defendant and Respondent.

990

COUNSEL

Bingham McMutchen, Stephen L. Kostka, Julie Jones and Nadia L. Costa for Plaintiff and Appellant.

Gary T. Ragghianti, Clark E. Guinan; Kerr & Wagstaffe, Michael Von Loewenfeldt; Remy, Thomas, Moose and Manley, Tiffany K. Wright; Goldfarb and Lipman, Lee C. Rosenthal and Barbara E. Kautz for Defendant and Respondent.

OPINION

**HORNER, J.**[*]—On appeal from a judgment denying its petition for writ of mandate, plaintiff and appellant St. Vincent's School for Boys, Catholic Charities CYO (St. Vincent's), contends: (1) defendant and respondent City of San Rafael (the City) unlawfully amended the provisions of its general plan to delete plans for the future annexation of property owned by St. Vincent's; (2) the City violated the California Environmental Quality Act (CEQA)[1] by certifying an inadequate environmental impact report (EIR) for the revisions to the general plan; (3) the housing element outlined in the City's amended general plan is legally deficient; and (4) the trial court erred by awarding the City costs for document retrieval. We affirm the judgment.

---

[*]Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1] Public Resources Code, section 21000 et seq.

FACTUAL & PROCEDURAL BACKGROUND

St. Vincent's owns 835 acres of unincorporated land in the County of Marin. The property lies to the north of the City of San Rafael, abutting the southern boundary of the City of Novato, and is set to the east of Highway 101, between it and the San Pablo Bay. The property is separated from the northern boundary of the City of San Rafael by the Silveira property, another tract of unincorporated lands which also sits between Highway 101 and the San Pablo Bay.

For many years the City and the County of Marin (County) cooperated in planning for the future use and development of the St. Vincent's and Silveira properties (jointly, the Properties). Although the Properties are physically located within the unincorporated area of the County, for planning purposes they were identified by the local agency formation commission (LAFCO) as within the City's sphere of influence and urban service area. Policies in earlier versions of the City's general plan and the Marin Countywide Plan anticipated that the Properties would be annexed to the City prior to or concurrent with the issuance of development permits.

The City's "general plan 2000," adopted in 1988, set forth detailed policies for the Properties describing environmental concerns and identifying development potential of up to 2,100 units. In 1998, the City and the County decided to enter a nonbinding memorandum of understanding to work cooperatively on a process to prepare recommended amendments to the City's general plan and the Marin Countywide Plan regarding the Properties. The City and County appointed a 16-member advisory task force, which included representatives from interest groups throughout the County, in order to prepare recommended general plan amendments for the City and County. Over a period of 20 months, the task force held meetings and study sessions with various community groups before presenting recommendations to the City in May 2000. The task force report stated that the appropriate level of development for the properties would be determined through subsequent environmental impact analysis of impacts on environmental characteristics as well as on traffic on Highway 101 and local streets. However, the report recommended the range of possible development for the Properties at between 800 and 1,500 units, reduced to 500 units with the purchase of development rights. The City accepted the task force recommendations by resolution dated May 3, 2000, and forwarded them to the general plan steering committee for incorporation into the general plan update.

On March 18, 2002, Shapell Industries and St. Vincent's submitted applications to the City for development of the St. Vincent's property alone, including a specific request for annexation of the St. Vincent's property. The

proposed development included 766 residential units, 120,000 feet of office space and additional retail space. The City sent a notice of preparation of a draft EIR on the proposed project to nearby property owners, as well as other local groups and agencies. In response, the City received about 50 letters from agencies and individuals, including the City of Novato and the County of Marin, identifying concerns with the proposal, including impacts on traffic and transit and the fact that the proposal did not proceed in conjunction with a plan for the Silveira property.

On April 7, 2003, the city council passed resolution No. 11288, denying the application by Shapell Industries/St. Vincent's for annexation and prezoning. Resolution No. 11288 acknowledged that "for many years, the City, County and the Marin County [LAFCO] have identified the [Properties] . . . as located within the City's Sphere of Influence," and that the city's "General Plan 2000, adopted in 1988, set forth policies for [the Properties] . . . identifying [their] development potential." The resolution found, however, that circumstances that may have favored prezoning and developing the St. Vincent's property had changed since adoption of general plan 2000 and acceptance of the task force recommendations. The resolution stated that any such future development had always been contingent upon the completion of infrastructure improvements to address roadway and sewer capacity constraints. These included road improvements such as extension of the McInnis Parkway and completion of the Lucas Valley Road/Smith Ranch Road interchange, as well as construction of a parallel arterial to Highway 101 to provide additional north/south capacity to Novato, as well as for police and fire emergency access.[2] Such improvements had not been made, the resolution noted, while at the same time traffic problems on Highway 101 had worsened, problems which the proposed development would compound. Additionally, the resolution noted that in the two years since the task force recommendations were adopted "public opposition to developing the area has grown" and a majority of the Marin County Board of Supervisors had expressed opposition to the proposed level of development for the St. Vincent's property. The resolution also noted that the St. Vincent's property "is not contiguous to the City, a necessity for any annexation."

Resolution No. 11288 also found that disapproving prezoning and annexation for the St. Vincent's proposal is consistent with general plan 2000 because nothing in the plan "affirmatively requires the City to actively pursue or to approve development of the [Properties]." Rejection of the proposal maintains the status quo, the resolution found, because the Properties are not currently zoned by the City but are currently zoned A-2 under the County's zoning ordinance. The resolution noted that the "County's zoning designation will remain in place . . . [and the City's rejection of the proposal] will in no

---

[2] The only existing road link between the City and the Properties is Highway 101.

way preclude future development of the property in a manner that is consistent with the County's General Plan."

The City had earlier signaled a possible change of tack on the annexation of the Properties, reflected in resolution No. 11237, which the city council unanimously passed on January 13, 2003. Resolution No. 11237 noted that whereas the City accepted the task force proposals for the Properties in May 2000, recent public comments and position statements by county supervisors have advocated more limited development and a greater planning role for the County in any such development. The resolution also noted that "the County has substantial involvement in the annexation process and considerable influence in connection with any ultimate decision respecting annexation of [the Properties] to the City as well as being a principal participant in the necessary negotiation of a tax sharing agreement with the City and through its participation on LAFCO possesses the ability to make annexation infea-sible following a lengthy land use entitlement process in the City that may likely require the City's defense of lawsuits and public referenda." Therefore, under the resolution, the city council directed staff "to prepare proposed amendments to the City's General Plan relating to the [Properties], indicating the City's determination not to annex or to serve these lands and directing that LAFCO remove them from the City's Sphere of Influence and Urban Service area as appropriate and to bring such proposed amendments to the Planning Commission and City Council for public hearing and consideration for adoption. In doing so staff is directed to include policies continuing the City's long advocacy that any future development of [the Properties] in the County should provide for maximum creation of workforce housing while protecting unique environmental features and habitat values and providing a fair economic use of these lands for their owners. The City Council further directs the General Plan 2020 Steering Committee also consider such policies in their preparation of a draft General Plan 2020 consistent with such Council direction."

Subsequently, "general plan 2020" was developed and adopted by the city council in a resolution passed on November 15, 2004. General plan 2020 did not provide for the future annexation of the Properties. Accordingly, in the adopting resolution the city council instructed staff "to formally request that the Marin [LAFCO] initiate proceedings to remove the [Properties] from the City's Sphere of Influence." The city council found that the 2020 plan is consistent with the intent of the Marin Countywide Plan to concentrate development in three environmental corridors, and which designates San Rafael within the "City-Centered Corridor." The council also found that plan 2020 is consistent with smart growth principles focusing on the development of community centers, including the downtown area and north San Rafael town center, appropriate design, mixed uses, and balanced transportation planning.

St. Vincent's filed its complaint and petition for writ of mandate on December 13, 2004. After demurrers by the City, St. Vincent's filed the operative, second amended complaint on May 25, 2005. The complaint alleges: "The City abandoned the opportunity to have a substantial amount of affordable housing actually built [on the St. Vincent's property] within its expanded borders because it assumed that the political winds had shifted. Instead of allowing the development at St. Vincent's that the multiple City general plans and the Advisory Task Force anticipated, the City proposed and later adopted amendments to its General Plan that reverse land use policies that have been in place for decades." The complaint asserted various causes of action, including violations of CEQA and violations of state planning and zoning law, and sought a writ of mandate declaring the City's general plan 2020 invalid and void *ab initio*.

A hearing on the petition for writ of mandate was held on September 19, 2006. On November 14, 2006, the trial court issued an order concluding that the City "did not act in an arbitrary and capricious manner in deciding . . . to approve its General Plan 2020 and in its earlier decision not to pursue annexation of [the St. Vincent's property]." In addition, the court found that the City did not violate CEQA or state planning laws in approving plan 2020. Consequently, the court denied St. Vincent's petition for writ of mandate. Judgment in favor of the City, including costs of suit, was entered on November 29, 2006. St. Vincent's filed a timely notice of appeal from the judgment on January 12, 2007. Subsequently, the trial court issued an order awarding the City costs in the amounts of $4,030.12 (for filing fees and court copy of administrative record) and $26,362.50 (information technology division fees for costs of retrieving e-mails).

DISCUSSION

A. *General Plan Amendments*

St. Vincent's asserts that the City decided to exclude the Properties from its general plan in January 2003, *before* conducting any CEQA analysis or preparing an EIR, and without considering relevant evidence relating to planning and land use criteria or the regional welfare. In a similar vein, St. Vincent's contends that the City's removal of its lands from general plan 2020 was an unlawful reaction to St. Vincent's development application.[3] On these grounds St. Vincent's contends the amendments to the general plan are unlawful.

As St. Vincent's points out, agencies are required by law to carry out an environmental assessment of a project before approving it. (*Laurel Heights*

---

[3] St. Vincent's did not appeal the City's denial of its planning application in 2003.

*Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 394 [253 Cal. Rtpr. 426, 764 P.2d 278] [" 'CEQA requires that an agency determine whether a project may have a significant environmental impact, and thus whether an EIR is required, *before* it approves that project.' "].) We also acknowledge that an ordinance is an invalid exercise of a city's police power where it constitutes arbitrary and discriminatory rezoning. (See, e.g., *Arnel Development Co. v. City of Costa Mesa* (1981) 126 Cal.App.3d 330, 337 [175 Cal.Rptr. 723] (*Arnel Development Co.*) [rezoning ordinance arbitrary and discriminatory where "without any significant change in circumstances and without considering appropriate planning criteria," property is rezoned "for the sole purpose of defeating the development"].) However, these legal precepts and authorities have no applicability here.

■ First, we reject the claim that the City amended its general plan without appropriate environmental review because there is no factual basis in the record to support it. Indeed, St. Vincent's contentions are founded on its characterization of resolution No. 11237 (passed on Jan. 13, 2003) as a final action requiring CEQA review. It was not. "[A]gencies must not 'take any action which gives impetus to a planned or foreseeable project in a manner that forecloses alternatives or mitigation measures' " without first carrying out CEQA review. (*Friends of the Sierra Railroad v. Tuolumne Park & Recreation Dist.* (2007) 147 Cal.App.4th 643, 654 [54 Cal.Rptr.3d 500].) Although "agency action approving or opening the way for a future development can be part of a project and can trigger CEQA even if the action takes place prior to planning or approval of all the specific features of the planned development[,] . . . [¶] . . . CEQA review is premature if the agency action in question occurs too early in the planning process to allow meaningful analysis of potential impacts. Although environmental review must take place as early as is feasible, it also must be 'late enough to provide meaningful information for environmental assessment.' (Cal. Code Regs., tit. 14, § 15004, subd. (b).)" (*Id.* at pp. 654–655.) Resolution No. 11237 was not a final decision on, or approval of, a project, which would have triggered CEQA review. Resolution No. 11237 did not by its terms *approve* changes to the general plan; rather, it directed staff to prepare amendments in line with certain guidelines, and bring those back for further consideration. In sum, we conclude the city council's passage of resolution No. 11237 did not trigger CEQA review.[4] Thus, St. Vincent's contentions on this point fail, because the

---

[4] *Citizens for Responsible Government v. City of Albany* (1997) 56 Cal.App.4th 1199 [66 Cal.Rptr.2d 102], cited by St. Vincent's, is easily distinguishable. There, the Court of Appeal noted that CEQA "defines the term 'project' to include an activity involving the issuance of an 'entitlement for use by one or more public agencies.' [Citation.] Since the development agreement gave Ladbroke a vested right to complete a gaming facility within certain clear and narrowly defined parameters, it constituted an 'entitlement for use' within the meaning of the statute." (56 Cal.App.4th at p. 1215.) Accordingly, the court concluded the project was subject

record shows that the City *did* conduct an EIR as required under CEQA before adopting general plan 2020 in November 2004.

We also reject St. Vincent's related contention that the amendments which removed its property from the City's general plan were an arbitrary and discriminatory action that exceeded the City's police powers. St. Vincent's asserts that "[o]nce an application has been submitted for a development project, applicable land use regulations . . . cannot be changed simply to defeat the project." St. Vincent's cites *Arnel Development Co., supra,* 126 Cal.App.3d 330, as "an archetypical case applying this rule." The facts here, however, do not warrant application of the rule.

In *Arnel Development Co.,* the City of Costa Mesa approved a final development plan as well as a tentative tract map for 68 acres of land within the city boundaries owned by the Arnel Development Company (Arnel). (*Arnel Development Co., supra,* 126 Cal.App.3d at pp. 333–334.) Following approval of the project, the city rezoned the property residential low and medium density "consistent with the general and specific plans for the express purpose of permitting the development." (*Id.* at p. 337.) Shortly after the city's approval of the Arnel development, a citizens group mounted an initiative petition to rezone the Arnel property single-family residential, which the voters subsequently adopted. Thereafter the city refused to approve a final tract map or issue building permits to Arnel. (*Id.* at p. 334.) The Court of Appeal stated that after enacting an ordinance rezoning the Arnel property consistent with its general plan, it would be arbitrary and discriminatory to later rezone the property "for the sole purpose of defeating the development" absent no "significant change in circumstances and without considering appropriate planning criteria." (*Id.* at p. 337.) "The city's authority under the police power is no greater than otherwise it would be simply because the subsequent rezoning was accomplished by initiative," the Court of Appeal added. (*Ibid.*) Here, by contrast, the St. Vincent's property was never subject to the City's police power, was never annexed by the City, and the City never approved any development proposals for the property. Rather, the City *rejected* St. Vincent's application for annexation and prezoning, a decision which St. Vincent's did not appeal. Moreover, the City's actions in removing

to CEQA review, and that such review should have been conducted before a voter ballot on the project because "the city council submitted a fully negotiated development agreement to the voters, together with other measures required for its immediate implementation. The negotiation of the 95-page development agreement—from the time of Ladbroke's initial application for a development agreement through the processes of staff review and three public hearings—unquestionably involved the exercise of judgment and deliberation, culminating in a decision to adopt an agreement with specific negotiated terms." (56 Cal.App.4th at p. 1219.) Here, St. Vincent's had no vested development rights and no negotiated agreement with the City, and the city council's resolution No. 11237 to consider proposed amendments to the general plan bears none of the hallmarks of finality noted in *Citizens for Responsible Government.*

St. Vincent's lands from its sphere of influence were to preserve the zoning status quo, not alter it to St. Vincent's detriment as in *Arnel Development Co.*[5]

*Merritt v. City of Pleasanton* (2001) 89 Cal.App.4th 1032 [107 Cal.Rptr.2d 675] (*Merritt*), a case decided by Division One of this court, is much more instructive. *Merritt* involved an appeal from denial of writ of mandate after property owners sought to compel the City of Pleasanton to set aside Measure P, a referendum on the owners' development proposal for their property. (*Merritt, supra,* 89 Cal.App.4th at p. 1034.) The property was unincorporated but was adjacent to the city and lay within its sphere of influence. The city had previously annexed land on both sides of the property. Owners submitted a proposal for a planned unit development (PUD) to construct 89 single-family homes. The city "adopted Ordinance No. 1769, approving a prezoning of the site to PUD, low-density residential." (*Ibid.*) However, the approved prezoning never occurred. Before ordinance No. 1769 took effect, residents raised enough petition signatures to submit the PUD to a referendum process known as "Measure P." (89 Cal.App.4th at pp. 1034–1035.) After Measure P was defeated at the polls the owners filed a petition for writ of mandate "arguing that the defeat of Measure P created an inconsistency with the City's general plan by 'promulgating an "unincorporated" zoning designation for the Property inconsistent with general plan objectives, policies, general land uses, and programs.' " (89 Cal.App.4th at p. 1035.)

On appeal from the trial court's denial of the writ, the owners contended that Measure P was arbitrary and capricious, and unfairly discriminated against the property, citing *Arnel Development Co.* (*Merritt, supra,* 89 Cal.App.4th at p. 1038.) The Court of Appeal rejected the owners' contention, stating: "In the present case, unlike the situation in *Arnel Development Co., supra,* 126 Cal.App.3d 330, the electorate did not change the Property's land use designation to preclude a particular type of needed housing. The defeat of Measure P simply maintained the status quo. In addition, unlike the situation in *Arnel,* the City's general plan was not amended to call for the immediate development of the Property, and there is no specific plan that calls for the development proposed by appellants." (*Id.* at p. 1038.) This is exactly the situation here. General plan 2020 maintained the status quo and did not

---

[5] St. Vincent's also relies on *Ross v. City of Yorba Linda* (1991) 1 Cal.App.4th 954 [2 Cal.Rptr.2d 638] (*Ross*), but this case too is entirely inapposite to the facts at hand. In *Ross,* the city applied a one-acre restriction to prevent a homeowner from building a second home on his 1.117-acre lot, which was surrounded by parcels of lesser size zoned at 1.8 houses per acre. The Court of Appeal held that this was an example of discriminatory land use legislation known as spot zoning, " '[w]here a small parcel is restricted and given less rights than the surrounding property.' " (*Ross, supra,* 1 Cal.App.4th at p. 960.) *Ross* is not instructive because spot zoning is not at issue here.

change the St. Vincent's property's prevailing land use designation to preclude a particular type of development, or indeed, to preclude any type of development.

■ In sum, we conclude that in adopting general plan 2020, including amendments which removed the St. Vincent's property from its sphere of influence for planning purposes, the City did not exceed its police powers by acting in an arbitrary and capricious manner and without conducting an environmental review. St. Vincent's may have preferred to remain within the City's sphere of influence and ultimately to have been annexed to the City, but such preferences do not translate into a legal right to such annexation. (*Rancho La Costa v. County of San Diego* (1980) 111 Cal.App.3d 54, 63 [168 Cal.Rptr. 491] ["We know of no authority which gives a property owner a vested right to have his property included within the boundaries of any particular city, district or authority. The prospect one's property might become more valuable if it is annexed to the city where certain special services are available at a more reasonable cost is a pleasant contemplation for a landowner, but it is certainly not a vested right."]; *City of Santa Cruz v. Local Agency Formation Com.* (1978) 76 Cal.App.3d 381, 389 [142 Cal.Rpt. 873] ["And no one has any *right*, constitutional or otherwise, to be included, or excluded, from a proposed annexation"].)

B. *CEQA*

St. Vincent's also challenges the sufficiency of the City's CEQA review of general plan 2020 on various grounds.

1. *Standard of Review*

■ "In a case challenging an agency's compliance with CEQA, we review the agency's action, not the trial court's decision. [Citation.] In doing so, our 'inquiry shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' [Citations.] Substantial evidence in this context means 'enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached.' [Citation.]" (*Save Round Valley Alliance v. County of Inyo* (2007) 157 Cal.App.4th 1437, 1446–1447 [70 Cal.Rptr.3d 59].)

■ Moreover, "[w]e do not review the correctness of the EIR's environmental conclusions, but only its sufficiency as an informative document. [Citation.] 'We may not set aside an agency's approval of an EIR on the

ground that an opposite conclusion would have been equally or more reasonable. "Our limited function is consistent with the principle that 'The purpose of CEQA is not to generate paper, but to compel government at all levels to make decisions with environmental consequences in mind. CEQA does not, indeed cannot, guarantee that these decisions will always be those which favor environmental considerations.' " [Citation.] We may not, in sum, substitute our judgment for that of the people and their local representatives. We can and must, however, scrupulously enforce all legislatively mandated CEQA requirements.' [Citation.]" (*Save Round Valley Alliance v. County of Inyo, supra*, 157 Cal.App.4th at p. 1447.)

### 2. *Analysis*

St. Vincent's asserts that the City violated CEQA by failing to investigate whether its reliance on "infill" and "redevelopment" sites for new housing would "displace development to more distant areas, resulting in leapfrog development and its attendant environmental ills." According to St. Vincent's, the EIR did not investigate whether such "growth displacement" might occur and also did not investigate "foreseeable indirect effects" of excluding the Properties from the general plan.

■ Underlying St. Vincent's criticism of the EIR is the suggestion that the City should have compared the effect of the amendments in general plan 2020 with the alternative of "leaving existing general plan policies [general plan 2000] providing for housing at the [Properties] in place."[6] However, such a comparison is not required under CEQA: Rather, an EIR is required to assess the impact of amendments to the general plan against existing conditions on the ground, not against the impact of the amendments on the previous version of the general plan. As one court put it: " 'CEQA nowhere calls for evaluation of the impacts of a proposed project on an existing general plan; it concerns itself with the impacts of the project on the environment, defined as the existing physical conditions in the affected area. The legislation evinces no interest in the effects of proposed general plan amendments on an existing general plan, but instead has clearly expressed concern with the effects of projects on the actual environment upon which the proposal will operate.' [Citation.]" (*Woodward Park Homeowners Assn., Inc. v. City of Fresno* (2007) 150 Cal.App.4th 683, 709 [58 Cal.Rptr.3d 102] (*Woodward Park*).) Noting that "[a] number of other cases reach similar conclusions [citations]," the *Woodward Park* court summarized the rule of those cases as follows: " '[I]n assessing the impacts of a project proposed for an undeveloped piece of property, agencies should compare project impacts

---

[6] For example, St. Vincent's asserts that "at issue here is a change in policy, from one encouraging feasible and reasonable development of housing on [the Properties], to one precluding development there." That is simply not the case. General plan 2020 does not "preclude" future development on the Properties. It merely divests the City of planning oversight for future development, which now falls to the County of Marin.

against the existing environment, rather than some hypothetical, impacted future environment that might occur without the project under existing general plan and/or zoning designations.' [Citation.]" (*Woodward Park, supra,* 150 Cal.App.4th at pp. 709–710.)

The EIR adequately addressed the impacts of the proposed amendments against existing conditions on the ground. Regarding proposed land use changes, the EIR clearly describes a "loss of 943 acres from the Planning Area, . . . [which] represents the removal of [the Properties] . . . includ[ing] 581 acres of Commercial-Mixed Use land (St. Vincent's/Silveira designation) and 363 acres of Parks and Open Space land." The EIR analyzed the environmental impacts and mitigation measures of such land use changes. The EIR concluded that such land use changes would not conflict with other adopted plans, such as the Marin County Zoning Ordinance and Marin Countywide Plan; that development consistent with general plan 2020 (Plan 2020) would not induce substantial growth and concentration of the City's population, especially when placed in a regional context; and that such development would result in a jobs-to-housing ratio of 1.52, representing "opportunities for more local workers to reside in the community, which has the potential to reduce future traffic generation." The EIR analyzed the growth-inducing impacts of the general plan amendments. It stated that "development in line with General Plan 2020 would result in up to . . . 5,104 additional households and 12,078 more residents within the Planning Area over existing conditions. While [Plan 2020] would accommodate this growth, in some instances it would have the effect of restricting development due to changes in land use designations. . . . Moreover, the proposed changes would be expected to concentrate urban development in areas that already have urban services."

Moreover, the City specifically addressed the issue of "displacement" or "leapfrog development" in its response to St. Vincent's comment on the EIR. The response notes Plan 2020 identified a list of housing sites, some of which will be rezoned to permit housing in districts where it is not currently allowed. With such proposed rezoning, the response notes Plan 2020 antici-pates that "all of the housing sites listed for the 1999–2007 planning period will be available for housing development with reasonable access to public services and without unusually high development costs." In sum, the EIR presents a "fair argument" that the Plan 2020 amendments to remove the Properties from the City's sphere of influence will not result in overspill or leapfrog development into surrounding areas. (*Save Round Valley Alliance v. County of Inyo, supra,* 157 Cal.App.4th at pp. 1446–1447.)

St. Vincent's also contends that the City violated CEQA by failing to compare project impacts to the impacts of the no-project alternative.

St. Vincent's asserts that the EIR failed to "compare the growth inducing implications of [the] two plans [Plan 2000 and Plan 2020] and their relative growth displacement effects." However, this claim is belied by the record because the EIR included an analysis of three alternatives to Plan 2020: "Alternative 1. No Project / No Development—existing conditions, no further development; Alternative 2. No Project / No Action / *General Plan 2000*—continued development under *General Plan 2000*; Alternative 3. Reduced Development—a lower intensity development alternative." The EIR assessed the impacts of these alternatives and compared them to Plan 2020 across a whole range of factors, including land use, transportation, air quality, noise, and public services. Moreover, the EIR notes that "[i]mpacts of development at the [Properties] are therefore discussed in Alternative 2, the No Project / No Action / *General Plan 2000* Alternative since *General Plan 2000* included development policies for the properties." In sum, the EIR adequately addressed alternatives to the Plan 2020.

## C. *The City's Housing Element*

### 1. *The Statutory Framework*

■ A city's broad police power is the constitutional source for its authority "to regulate land through planning, zoning, and building ordinances, thereby protecting public health, safety and welfare. [Citations.]" (*Fonseca v. City of Gilroy* (2007) 148 Cal.App.4th 1174, 1181 [56 Cal.Rptr.3d 674] (*Fonseca*).) "[T]he framework for the exercise of that power is provided by the state's land use planning statutes. [Citations.]" (*Ibid.*) State planning statutes require the "adoption of a general plan," [which is] the " ' "basic land use charter governing the direction of future land use" ' in the locality. [Citations.]" (*Fonseca, supra*, 148 Cal.App.4th at p. 1182.) "Declaring affordable housing 'a priority of the highest order' and one not merely a local concern but a matter of 'vital statewide importance,' the Legislature in 1980 enacted legislation to require each local government to adopt a 'housing element' as a component of its general plan. (§§ 65580, subd. (a), 65581, subd. (b), 65582, subd. (d).) According to the Housing Element Law, a public locality's general plan 'must include a housing element consisting of several mandatory components.' [Citation.]" (*Ibid.*)

Government Code former section 65583 specified these mandatory components.[7] Generally, it provided that "[t]he housing element shall consist of an identification and analysis of existing and projected housing needs and a statement of goals, policies, quantified objectives, financial resources, and

---

[7] Government Code section 65583 was amended effective January 1, 2005, to December 31, 2005. (See Stats. 2004, ch. 724, § 1.) Further statutory references are to the 2004 Government Code sections in effect when the City adopted Plan 2020 in November 2004.

scheduled programs for the preservation, improvement, and development of housing. The housing element shall identify adequate sites for housing, including rental housing, factory-built housing, and mobilehomes, and shall make adequate provision for the existing and projected needs of all economic segments of the community." (Former § 65583.)

■ The housing element must include "[a]n assessment of housing needs and an inventory of resources and constraints relevant to the meeting of these needs[,] . . . includ[ing] . . . [¶] (1) An analysis of population and employment trends and documentation of projections and a quantification of the locality's existing and projected housing needs for all income levels. These existing and projected needs shall include the locality's share of the regional housing need in accordance with Section 65584. [¶] . . . [¶] (3) An inventory of land suitable for residential development, including vacant sites and sites having potential for redevelopment, and an analysis of the relationship of zoning and public facilities and services to these sites." (Former § 65583, subd. (a)(1), (3).) Also, the housing element must contain "[a] statement of the community's goals, quantified objectives, and policies relative to the maintenance, preservation, improvement, and development of housing." (Former § 65583, subd. (b)(1).)

■ Additionally, the housing element must include "[a] program which sets forth a five-year schedule of actions the local government is undertaking or intends to undertake to implement the policies and achieve the goals and objectives of the housing element through the administration of land use and development controls, provision of regulatory concessions and incentives, and the utilization of appropriate federal and state financing and subsidy programs when available. . . ." (Former § 65583, subd. (c).) ■ Moreover, "[i]n order to make adequate provision for the housing needs of all economic segments of the community, the program shall . . . [¶] . . . [i]dentify actions that will be taken to make sites available during the planning period of the general plan with appropriate zoning and development standards and with services and facilities to accommodate that portion of the city's or county's share of the regional housing need for each income level that could not be accommodated on sites identified in the inventory completed pursuant to paragraph (3) of subdivision (a) without rezoning. Sites shall be identified as needed to facilitate and encourage the development of a variety of types of housing for all income levels, including multifamily rental housing, factory-built housing, mobilehomes, housing for agricultural employees, emergency shelters, and transitional housing. [¶] . . . Where the inventory of sites, pursuant to paragraph (3) of subdivision (a), does not identify adequate sites to accommodate the need for groups of all household income levels pursuant to Section 65584, the program shall identify sites that can be developed for housing within the planning period pursuant to subdivision (h) of Section 65583.2." (Former § 65583, subd. (c)(1)(A).)

## 2. *Standard of Review*

When an interested party challenges a city's housing element in a mandamus action, the trial court's review " 'shall extend to whether the housing element or portion thereof or revision thereto substantially complies with the requirements of [the Housing Element Law].' [Citation.] ' " ' "Substantial compliance . . . means *actual* compliance in respect to the substance essential to every reasonable objective of the statute," as distinguished from "mere technical imperfections of form." ' [Citation.]" ' [Citations.] Simply stated, '[j]udicial review of a housing element for substantial compliance with the statutory requirements does not involve an examination of the merits of the element or of the wisdom of the municipality's determination of policy.' [Citation.] It merely involves a determination whether the housing element includes the statutory requirements. [Citation.] . . . [T]he court's role in determining a mandamus challenge to a locality's housing element is simply to determine whether the locality has satisfied statutory requirements. It is not to reach the merits of the element or to interfere with the exercise of the locality's discretion in making substantive determinations and conclusions about local housing issues, needs, and concerns." (*Fonseca, supra,* 148 Cal.App.4th at p. 1185.)

"On appeal, we independently ascertain as a question of law whether the housing element at issue substantially complies with the requirements of the Housing Element Law, substantial compliance meaning ' " ' "*actual* compliance in respect to the substance essential to every reasonable objective of the statute," as distinguished from "mere technical imperfections of form." ' [Citation.]" ' [Citations.] In our independent review of the housing element's legal adequacy, we afford no deference to the trial court's conclusions. [Citations.]" (*Fonseca, supra,* 148 Cal.App.4th at p. 1191.) "On the other hand, a city's adoption of a housing element is a legislative enactment, something which is generally entitled to some deference. *There is a presumption that the adopted element is valid and we do not in the course of our review evaluate the municipality's determination of policy.* [Citations.] The burden is on the challenger to demonstrate that the housing element, and by extension the general plan, is inadequate. [Citation.] If the municipality has substantially complied with statutory requirements, we will not interfere with its legislative action, unless that action was arbitrary, capricious, or entirely lacking in evidentiary support. [Citations.] [¶] Accordingly, like the trial court, we do not review the merits of the housing element at issue or assess the wisdom of the municipality's determination of policy. [Citation.] Nor do we judge whether the programs adopted by the locality are adequate to meet their stated objectives. [Citation.] Our review thus comes down to independently determining whether the housing element at issue is in substantial compliance with applicable statutory requirements, i.e., does it contain the elements mandated by the statute." (*Id.* at pp. 1191–1192, italics added.)

### 3. *Analysis*

St. Vincent's contends that the City's housing element fails to comply with the statutory requirements of section 65583. Specifically, St. Vincent's asserts that the City's housing element does not identify adequate sites for residential development, in violation of section 65583, subdivision (c)(1). According to St. Vincent's, "in a poorly conceived effort to make up for the loss of residential land caused by its abandonment of the St. Vincent's and Silveira sites, the City suddenly discovered new 'infill' and 'redevelopment' sites for housing" but failed "to show that development of residential uses on these sites during the five year planning cycle is feasible." We are not persuaded.

The City's housing element included the inventory of land suitable for residential development required under section 65583, subdivision (a)(3). The inventory included an analysis of the residential potential in the various land use districts, identifying a total of 395 acres of vacant/underdeveloped land with a potential yield of 5,091 additional units. The inventory also included analysis of how many of those potential additional units could be developed within the 1999–2007 timeframe of the housing element by looking at single-family sites and second units, multifamily sites, mixed use sites, and sites currently zoned nonresidential where housing will be allowed pending land use and zoning changes in Plan 2020; by identifying specific downtown development sites, including potential sites with planning application pending and other potential sites for downtown housing development; and by identifying the potential for housing development in other specific areas, such as the Loch Lomond Marina, Marin Square, the area around Davidson Middle School and the commercial and office areas around Northgate Town Center. On that basis, it states that 1,468 units are available to be developed (more than the City's remaining regional housing need of 928 units), and that the residential potential "exceeds [the City's] remaining regional housing need for 800 units for very low [418], low [130], and moderate income households (252)."

Regarding section 65583, subdivision (c)'s requirement for a five-year schedule of actions, the housing element includes an analysis of plans and programs to promote and develop identified housing needs over this timeframe. These include policies for the funding of affordable housing; for the protection of existing housing stock and use; for innovative housing initiatives (e.g., limited equity cooperatives and "sweat equity" housing); to maintain an adequate supply of land designated for all types of residential development; to promote mixed use development allowing residential uses in commercial areas; and to allow higher densities on sites adjacent to transit hubs. Additionally, the housing element satisfied the requirements of section 65583, subdivision (c)(1)(A) by identifying adequate sites and analyzing the

required infrastructure needs of the sites. For example, the housing element described specific multifamily sites that are currently available and outlined the factors that would make those sites favorable to housing development, such as the ready availability of public facilities, services and infrastructure, incentives such as density bonuses, and the predominance of similar uses in the vicinity of the site. It also describes five downtown redevelopment sites for which development applications were pending for over 200 units. And it contains an analysis of potential mixed use sites in downtown San Rafael, discussing incentives for development, such as lower parking requirements, higher allowable densities, and height bonus.

St. Vincent's, however, demands more. Relying on *Hoffmaster v. City of San Diego* (1997) 55 Cal.App.4th 1098, 1112–1113 [64 Cal.Rptr.2d 684] (*Hoffmaster*), St. Vincent's argues that the City failed in its "affirmative duty to demonstrate how its newly-conceived housing strategy could actually produce the units it claimed." *Hoffmaster* imposed no such affirmative duty, nor did the applicable planning statutes.[8] In *Hoffmaster*, representatives of homeless persons in the City of San Diego claimed the city's housing element failed "to comply with section 65583, subdivision (c)(1) by neither properly designating adequate real property sites which [the city] would make available for homeless emergency shelters and transitional housing, nor providing a five-year action plan to implement the goals and policies of the housing element by various means, including facilitating the development of emergency shelters and transitional housing on designated sites." (*Hoffmaster, supra*, 55 Cal.App.4th at p. 1103.)

The appellate court stated that in order "[t]o substantially comply with the identification of adequate sites requirement of subdivision (c)(1) here, [the city] must provide an inventory of sites which will be made available through features of its program to meet its quantified housing objectives as to the homeless." (*Hoffmaster, supra*, 55 Cal.App.4th at p. 1112.) However, the court further stated that "for identification to be meaningful, it must necessarily be specific. It must set forth sites which will be available to be developed, without restrictive zoning burdens which combined with the NIMBY (Not In My Back Yard) factor (discussed at length in separate council hearings) become insurmountable or produce protracted delays and deterrent cost increases. Available sites should be officially designated and publicized, preferably in the housing element, for this use. Finally, through its action program, [the city] bears the responsibility to ensure the regulatory process actually encourages the development of emergency shelters and transitional housing." (*Id.* at p. 1114.) After examining the city's action program, the court concluded that "through its blanket CUP [conditional use permit]

---

[8] We need not and do not address whether the post-2004 amendments to section 65583 impose any such requirement

requirement and the quarter-mile geographical restriction, the residential care facility ordinance as presently constituted substantially constrains siting homeless facilities for emergency shelter and meaningful transitional housing in any location within [the city]." (*Hoffmaster, supra*, 55 Cal.App.4th at p. 1115). Moreover, the court further concluded that the remaining features of the city's program did not sufficiently offset the effect of this restrictive ordinance, resulting in a housing element which failed to meaningfully identify adequate sites available for development of both emergency shelter and transitional housing to meet the city's quantified objectives as to the homeless. (*Id.* at pp. 1115–1117.)

The thrust of the appellate court's analysis in *Hoffmaster* is not that a city's housing element must demonstrate how its housing strategy will "actually produce" a specific number of housing units. Rather, it is that a city is not in substantial compliance with section 65583, subdivision (c)(1) simply because it identifies suitable sites to meet an identified housing need, if it then places planning and zoning restrictions in the way of any actual development of those sites to meet the identified housing need. (*Hoffmaster, supra*, 55 Cal.App.4th at p. 1117 ["Within a zoning and land-use context, . . . [a]dequate funding and ownership of land does not equate to available usable sites, *absent a program of zoning development controls, meaningful regulatory concessions and incentives which will permit and encourage such development*" (italics added)].)

There is no such flaw, however, in the City's housing element here. As noted above, the City has tailored its regulatory activities and zoning controls to *maximize* the potential for housing development at identified sites, not to frustrate development as in *Hoffmaster, supra*, 55 Cal.App.4th 1098. The City has developed policies to change zoning in order to allow housing in sites not currently zoned residential; reduce parking standards and increase height bonuses for downtown developments; revise its second unit ordinance to reduce the time and cost of adding second units to existing single-family homes; establish fee waivers, including traffic impact, planning, and building fees for affordable housing projects; to utilize the City's priority project selection program (PSP), which allocates traffic capacity to proposed development projects, to encourage affordable housing projects; and to permit density bonuses above and beyond those mandated by state law pursuant to the City's inclusionary housing ordinance. In sum, while St. Vincent's may disagree with the City's policy decision to base its housing element on fostering development within existing city limits instead of annexation, it has failed in its burden to overcome the presumption that the housing element is valid and show it is not in substantial compliance with the statutory requirements. (*Fonseca, supra*, 148 Cal.App.4th at pp. 1191–1192.)

## D. *Costs*

The trial court awarded the City costs "listed as Information Technology Division fees in the amount of $26,362.50." The trial court stated: "These costs are described as time spent in the email search and production efforts of City programmers or analysts, calculated at a 'fully burdened' rate. After argument [on St. Vincent's motion to tax costs], the court again reviewed the record in this case and can recall petitioner's insistence that the record be augmented with the parties' email exchanges. The court will allow the staff time spent in this cumbersome retrieval process, but will not award the attorneys' fees claimed as attributable to these efforts." St. Vincent's does not dispute that the City incurred these costs, or that they were reasonable and necessary for the litigation, nor does it challenge the rates at which the costs were assessed. Rather, St. Vincent's contends that the award of costs is barred as a matter of law both by Code of Civil Procedure section 1033.5 and by the California Public Records Act (Gov. Code, § 6250 et seq.).

### 1. *Statutory Framework*

Public Resources Code section 21167.6 (hereafter section 21167.6) provides that at the time a CEQA action is filed, "the plaintiff or petitioner shall file a request that the respondent public agency prepare the record of proceedings relating to the subject of the action or proceeding. The request, together with the complaint or petition, shall be served personally upon the public agency not later than 10 business days from the date that the action or proceeding was filed." (§ 21167.6, subd. (a).) Thereafter, "[t]he public agency shall prepare and certify the record of proceedings not later than 60 days from the date that the request specified in subdivision (a) was served upon the public agency. Upon certification, the public agency shall lodge a copy of the record of proceedings with the court and shall serve on the parties notice that the record of proceedings has been certified and lodged with the court. *The parties shall pay any reasonable costs or fees imposed for the preparation of the record of proceedings in conformance with any law or rule of court.*" (§ 21167.6, subd. (b)(1), italics added.) However, "[t]he plaintiff or petitioner may elect to prepare the record of proceedings or the parties may agree to an alternative method of preparation of the record of proceedings, subject to certification of its accuracy by the public agency, within the time limit specified in this subdivision." (§ 21167.6, subd. (b)(2).)

The reference to "reasonable costs or fees . . . in conformance with any law or rule of court" in section 21167.6, subdivision (b)(1), "leads us to the general rules applicable to the award of costs, which are set forth in Code of Civil Procedure sections 1032, 1033 and 1033.5. [¶] First, except as otherwise expressly provided by statute, the party who prevails in any action

or proceeding 'is entitled as a matter of right to recover costs.' (Code Civ. Proc., § 1032, subd. (b).)" (*Wagner Farms, Inc. v. Modesto Irrigation Dist.* (2006) 145 Cal.App.4th 765, 773 [52 Cal.Rptr.3d 683] (*Wagner Farms*).) And in further reference to costs, section 21167.6 provides that "[i]n preparing the record of proceedings, the party preparing the record shall strive to do so at reasonable cost in light of the scope of the record." (§ 21167.6, subd. (f).)

### 2. *Analysis*

Based on the above provisions of section 21167.6 and the Code of Civil Procedure provision awarding costs to the prevailing party, the court in *Wagner Farms* concluded that "the prevailing party in a CEQA proceeding . . . may recover as costs the amounts it reasonably and necessarily incurred in preparing the ROP [record of proceedings]." (*Wagner Farms, supra*, 145 Cal.App.4th at p. 774.) St. Vincent's, however, asserts that the rule of *Wagner Farms* does not apply here because, pursuant to section 21167.6, subdivision (b)(2), it elected to prepare the record, and CEQA authorizes recovery of costs for record preparation only by a prevailing party who has actually prepared the record. St. Vincent's asserts that "[i]n no reported case has a court awarded costs of record preparation to a party where the other party elected to prepare the record of proceedings." St. Vincent's further asserts that the very purpose of the rule allowing a petitioner to prepare the record of proceedings is to "allow[] the petitioner to control the costs of record preparation" and this purpose is frustrated by an award of costs to the City for purposes of record preparation.

We are not persuaded. In the first place, the City is not seeking to recover the *entire cost* for preparation of the record of proceedings (ROP) because it did not prepare the ROP, St. Vincent's did. Rather, the question here is whether the City is precluded by St. Vincent's election under section 21167.6, subdivision (b)(2) from recovering *any costs whatsoever* in connection with preparation of the record, even when the City is the prevailing party, and even when the City incurred certain extraordinary costs at St. Vincent's behest. As explained below, we do not think such a blanket preclusion on costs to the prevailing party sits well with the cost-containment policy embodied in section 21167.6.

### (a)

The cost-containment policy embodied in section 21167.6 was explained in *Hayward Area Planning Assn. v. City of Hayward* (2005) 128 Cal.App.4th 176 [26 Cal.Rptr.3d 783] (*City of Hayward*), a decision issued by Division Five of this court. There, the plaintiffs filed a petition for writ of mandate against the city, alleging noncompliance with CEQA. (*City of Hayward, supra,* 128

Cal.App.4th at p. 179.) The developer of the affected project was identified as the real party in interest. (*Ibid.*) After the city advised the plaintiffs regarding the anticipated volume of the record and costs associated with its preparation, the plaintiffs elected to have the city prepare the ROP, pursuant to section 21167.6, subdivision (a). (128 Cal.App.4th at p. 179.) However, the city, apparently in order to ensure timely completion of the record, asked the developer's attorneys to prepare the ROP. The plaintiffs were never advised of this arrangement, and the final record was much longer than the city's original projection. (*Ibid.*) Subsequently, the trial court denied the writ petition, entered judgment in favor of the city, and awarded both the city and the developer costs. (*Id.* at p. 180.)

The developer sought over $50,000 in costs, mostly associated with preparation of the ROP. (*City of Hayward, supra,* 128 Cal.App.4th at p. 180.) The plaintiffs moved to tax costs on various grounds, including that costs of record production were not properly awarded to the developer because preparation of the record was the responsibility of the city under section 21167.6, subdivision (a). (128 Cal.App.4th at p. 180.) The trial court agreed, but rather than denying the developer's costs entirely, it taxed the costs to reflect what costs would have been incurred had the city prepared the record itself, and awarded costs in the reduced amount of $20,359.65. (*Ibid.*) The plaintiffs appealed the trial court's decision to award the developer costs. (*Ibid.*)

On appeal, the issue was one "of statutory construction: does section 21167.6 authorize the court to award the costs of preparing a CEQA administrative record to a real party in interest absent Plaintiffs' consent?" (*City of Hayward, supra,* 128 Cal.App.4th at p. 181.) The appellate court noted that the statute did not expressly bar a real party in interest from recovering costs of preparing the record. (*Id.* at p. 183.) However, language in section 21167.6, subdivision (b)(1) that " '[t]he parties shall pay any reasonable costs or fees imposed for the preparation of the record of proceedings in conformance with any law or rule of court' " was ambiguous, the court added. (128 Cal.App.4th at p. 183.) On the one hand, "[b]ecause the provision appears in subdivision (b)(1), which authorizes the public agency to prepare the record, it can be construed to permit only the public agency to claim those costs. On the other hand, as [the developer] argues, it can be construed to allow costs to any party because the only express restriction is that costs be awarded in conformance with applicable law." (*Ibid.*)

Construing the ambiguity "in a manner consistent with the statutory scheme and purpose," the court observed that "the three-part scheme for preparing the record advances the legislative purpose of enabling the petitioner to minimize the cost of record preparation. When the record is

prepared under section 21167.6, subdivision (b)(2), either the petitioner directly controls the costs by its personal assumption of the task or it indirectly controls the costs by consenting to an alternative arrangement. When the agency prepares the record under section 21167.6, subdivision (b)(1), costs are controlled in three ways. First, as occurred in this case, the petitioner may request an initial cost estimate to inform its decision whether to prepare the record itself. That cost estimate serves as a restraint on the agency's ultimate recovery of costs. Second, the agency has a duty to act in the public interest and it is accountable to its constituents for the use of public funds. Had the City here, for example, contracted with [the developer] and assumed responsibility for the costs in the first instance, it would have been required to file a cost bill in its own name. Third, the agency is bound by the statutory mandate to minimize costs, which the trial court enforces by taxing unreasonable costs. (§ 21167.6, subd. (f).)" (*City of Hayward, supra,* 128 Cal.App.4th at pp. 183–184.)

"In the circumstances of this case," the court concluded, "the cost restraints inherent" in "the statutory scheme for controlling the costs of record preparation" had been undermined in various ways by the city's delegation to the developer of the task of record production. (*City of Hayward, supra,* 128 Cal.App.4th at p. 184.) For example, "[u]nlike a public agency, a developer real party in interest has a strong financial interest in the outcome and is free to act purely in its private interest. Because the City did not directly incur any liability for the costs, it had no incentive to control those costs." (*Id.* at p. 185.) The court further concluded that "[t]he City's delegation of the task to [the developer] also undermined the statutory purpose of expediting CEQA litigation. (See § 21167.1, subd. (a).) As a result of the skewed incentives caused by the delegation, the mounting costs of record preparation did not come under scrutiny until the end of the trial court proceedings. Under the Legislature's scheme, either the plaintiff or the defendant public agency or both would have had reason to control those costs as the record was being prepared, promoting efficiency and limiting the need for time consuming litigation and judicial intervention." (*Id.* at p. 185.) Accordingly, the court held that "in order to preserve the statutory scheme and purpose of section 21167.6, subdivision (b), the public agency must itself incur and seek recovery of the costs of record preparation when the record is prepared under subdivision (b)(1). Because that did not occur in this case, costs must be denied." (*Ibid.*)

*(b)*

*City of Hayward* is highly instructive in resolving the issue of statutory interpretation presented here, which is: does section 21167.6 preclude an award of costs in favor of the prevailing party in any amount in connection

with record preparation if the plaintiff elects to prepare the record pursuant to section 21167.6, subdivision (b)(2)? As in *City of Hayward,* the statutory language is ambiguous on this issue, and for much the same reasons. The statute does not expressly prohibit costs under these circumstances. On the one hand, the reference to "reasonable costs" is in subdivision (b)(1), which governs the public agency's preparation of the record, so it could be construed to permit only the public agency to claim those costs when it prepares the record. On the other hand, it may not preclude the public agency from claiming costs associated with record preparation even when it did not prepare the record if such an award is "in conformance with" applicable law (§ 21167.6, subd. (b)(1)), such as Code of Civil Procedure section 1032, subdivision (b), which provides that a party who prevails in any action or proceeding "is entitled as a matter of right to recover costs."

As in *City of Hayward,* therefore, we must decide this issue in light of the statutory scheme to expedite and contain costs in CEQA litigation. (See *City of Hayward, supra,* 128 Cal.App.4th at pp. 184–185.) We conclude that under the circumstances presented here, the statutory purpose of section 21167.6 is best served by upholding the award of costs against St. Vincent's in connection with record preparation. St. Vincent's elected to prepare the record pursuant to section 21167.6, subdivision (b)(2). By doing so, it undertook the solemn statutory obligation to "strive [to prepare the record] at reasonable cost in light of the scope of the record." (§ 21167.6, subd. (f).)

*(c)*

In connection with this litigation, the City assembled 2,208 documents amounting to over 58,000 pages over a period between December 2004 and April 2005. Given the massive amount of documentation involved, the City required, and St. Vincent's stipulated to, three extensions of time to certify the record. The City finally turned over 20 boxes of documents to St. Vincent's in April 2005. St. Vincent's noted that the 20 boxes contained only a few e-mails, so in June 2005 it submitted a Public Records Act request to the City asking for "all writings evidencing or reflecting communications, stored on computer hard drive or server of any City employee, relating to or in connection with St. Vincent's property or the Silveira property."

This request resulted in further delay. In July 2005, the City advised that over nine boxes' worth of e-mails would have to be vetted for responsiveness. The parties stipulated to an extension of time through August 2005, so that the City could complete this review. In October 2005, however, the city attorney's office was still working on reviewing and sorting the e-mails retrieved as a result of St. Vincent's request. The City's search for e-mails did not conclude until December 2005, and the responsive, nonprivileged e-mails were then forwarded to counsel for St. Vincent's.

St. Vincent's was not satisfied with the City's production of e-mails. In a January 9, 2006, case management statement, St. Vincent's stated that "production is incomplete and the City states that it is complete. The parties are attempting to resolve the issue so that the record can be completed." However, on January 11, 2006, St. Vincent's served a demand for inspection on the City, listing 15 further demands for documents. In a June 26, 2006, case management statement, St. Vincent's recited the history of its request for e-mails, stating that because the City did not routinely discard e-mails from its computer system, its search had resulted in "nine boxes of potentially responsive emails." However, St. Vincent's continued, the City only "produced two stacks totaling less than two inches of paper. These emails were almost entirely non-substantive . . . and largely duplicated each other." St. Vincent's recited that it had demanded an explanation as to why the City "withheld[] so many emails" and had served a demand for inspection. In response, St. Vincent's related, the City had identified five classes of privileged documents and, after a meet-and-confer process, the City had produced a privilege log covering 181 documents. St. Vincent's complained that to date it "has received no explanation for the apparently vast number of emails that have been withheld." St. Vincent's added that on April 26, 2006, it had filed its opening brief on the mandate claims "although the record of proceedings had not yet been certified."

### (d)

This record reflects a total disregard for cost containment on St. Vincent's part, and a complete abandonment of its statutory duty to "strive to [prepare the record] at reasonable cost." (§ 21167.6, subd. (f).) After three extensions of time, the City gave St. Vincent's 20 boxes of documents in April 2005. St. Vincent's then subjected the City to a costly and lengthy process of trawling through its entire computer system in response to an extremely broad and unbounded search for "all writings evidencing or reflecting communications . . . relating to or in connection with the St. Vincent's property or the Silveira property." And St. Vincent's rationale for this?—not because it had identified any "gaps" in the voluminous planning documents contained in the 20 boxes, but because it was not satisfied with the number of e-mails contained in the 20 boxes. In abandoning its statutory duty to contain costs, St. Vincent's may be likened to the developer real party in interest in *City of Hayward* who, "[u]nlike a public agency, . . . has a strong financial interest in the outcome and is free to act purely in its private interest." (*City of Hayward, supra,* 128 Cal.App.4th at p. 185.) Moreover, because St. Vincent's, like the City of Hayward, "did not directly incur any liability for the [additional] costs [of the computer search], it had no incentive to control those costs." (*Id.* at p. 185.) Furthermore, as in *City of Hayward,* St. Vincent's discovery actions also "undermined the statutory purpose of expediting CEQA litigation."

(*Ibid.*) The statute provides that the record should be prepared and certified within 60 days (§ 21167.6, subd. (b)(1)), but this record was not certified until July 18, 2006, 15 months after the City delivered 20 boxes of documents to St. Vincent's. *It is telling that after all this, St. Vincent's does not mention one single e-mail, obtained in response to its request, which provided information that bolstered any of its claims in this case. Indeed, we wonder what the point of it all was, because, as noted, St. Vincent's filed its brief before the issue of the e-mails was ever resolved.*

 In conclusion, as in *City of Hayward,* the circumstances here demonstrate that "the cost restraints inherent" in "the statutory scheme for controlling the costs of record preparation" have been undermined by St. Vincent's additional, broad, unrestricted, and, apparently nonessential, discovery demands. (*City of Hayward, supra,* 128 Cal.App.4th at p. 184.) St. Vincent's actions, which caused the City to expend considerable time and resources in responding to its discovery demands, reflect a complete abandonment of its statutory responsibility to "strive to [prepare the record] at reasonable cost." (§ 21167.6, subd. (f).) The ensuing delay to the CEQA litigation process caused by St. Vincent's demands also "undermined the statutory purpose of expediting CEQA litigation." (*City of Hayward, supra,* 128 Cal.App.4th at p. 185.) Accordingly, we hold that where necessary to preserve the statutory purposes of cost containment and expediting CEQA litigation, the prevailing party in a CEQA action may recover "reasonable costs or fees imposed for the preparation" (§ 21167.6, subd. (b)(1)) of the record, even if the nonprevailing party elected to prepare the record pursuant to section 21167.6, subdivision (b)(2).[9] To hold otherwise would only reward litigants who, like St. Vincent's, elect to prepare the record but then ignore the concomitant statutory duty to restrain costs in doing so. In light of our holding that section 21167.6 does not preclude an award of costs in favor of the City, we will not disturb on appeal the trial court's exercise of its sound discretion in awarding information technology fees in the amount of $26,362.50. (*River Valley Preservation Project v. Metropolitan Transit Development Bd.* (1995) 37 Cal.App.4th 154, 181 [43 Cal.Rptr.2d 501] ["Whether a particular cost to prepare an administrative record was necessary and reasonable is an issue for the sound discretion of the trial court," which the trial court abuses only if its decision exceeds the bounds of reason.].)

---

[9] In so holding, we reject St. Vincent's attempt to avoid its statutory duties under CEQA by cloaking its discovery actions under the Public Records Act. St. Vincent's instigated this mandamus action under CEQA and is bound by its statutory provisions.

## DISPOSITION

The judgment is affirmed. St. Vincent's shall bear costs on appeal.

Pollak, Acting P. J., and Siggins, J., concurred.

On April 15, 2008, the opinion was modified to read as printed above.